UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                                     :

RURADAN CORPORATION                          :

                       :

                   Plaintiff,          :

                       :                 22-cv-03074 (LJL)

          -v-                      :

                       :            <u>OPINION AND ORDER</u>

CITY OF NEW YORK, JIN CHOI, MATTHEW AHN,   :
RAYMOND KIM, L&K 48 VENTURE, INC., and
JLEE 19 CORP.,                           :

                       :

                   Defendants.       :

                       :

------------------------------------------------------------------ X

<div style="border:1px solid black">
USDC SDNY<br>
DOCUMENT<br>
ELECTRONICALLY FILED<br>
DOC #:_____<br>
DATE FILED:_03/24/2023__
</div>

LEWIS J. LIMAN, United States District Judge:

        Plaintiff Ruradan Corporation ("Plaintiff" or "Ruradan") brings claims against defendant

City of New York ("City Defendant") and defendants Jin Coi, Matthew Ahn, Raymond Kim,

L&K 48 Venture, Inc., and Jlee 19 Corp. ("Toasties Defendants," and, together with the "City

Defendant," "Defendants") related to the default of a commercial lease at 8 East 48th Street New

York, New York (the "Premises").  Dkt. No. 40 ("Amended Complaint" or "Am. Compl.").

Plaintiff is the owner and landlord of the Premises and challenges N.Y.C. Administrative Code

Section 22-1005 (the "Guaranty Law"), which prohibits commercial landlords from enforcing

personal guarantees of certain commercial leases for defaults accruing between March 7, 2020,

and June 30, 2021.  *Id.*; *see also* N.Y.C. Admin. Code § 22-1005.

        Plaintiff filed the Amended Complaint on August 10, 2022, and, after no responsive

pleading from the Toasties Defendants, Plaintiff moved for a certificate of default against the

Toasties Defendants.  Dkt. No. 52.  The Clerk of Court entered a certificate of default against the

Toasties Defendants on August 29, 2022.  Dkt. No. 59.

The Toasties Defendants now move to set aside the certificate of default.  Dkt. No. 53. Defendants also move to dismiss the operative complaint.  Dkt. Nos. 44, 56.

For the reasons that follow, the Toasties Defendants' motion to set aside the default is granted, and the entry of default is vacated.  The motions to dismiss are granted with respect to Plaintiff's claims under the Takings Clause and the Due Process Clause of the U.S. Constitution and the claim brought under the New York Constitution and the Municipal Home Rule Law. The motions to dismiss are denied with respect to Plaintiff's claim brought under the Contracts Clause of the U.S. Constitution and the claim for breach of contract under New York state law.

## BACKGROUND

The Court accepts the well-pleaded facts of the Amended Complaint as true for the purposes of the motions to dismiss.

Plaintiff is a New York corporation that is the owner and landlord of the Premises, a multi-unit apartment building containing residential and commercial rental space.  Am. Compl. ¶ 10.  On or about May 15, 2014, Defendant L&K 48 Venture, Inc., as tenant doing business as "Toasties," entered into a commercial lease with Plaintiff as landlord (as subsequently modified, the "Lease"), for the use and occupancy of t Store No. 1 at the Premises.  *Id.* ¶ 11.  The Lease was for a term through August 31, 2029.  *Id.* ¶ 12.  Defendants Jin Choi, Matthew Ahn, and Raymond Kim executed and delivered to Plaintiff a guaranty dated May 15, 2014 (the "Guaranty"), whereby Choi, Ahn, and Kim ("Guarantors") personally guaranteed the obligations under the Lease.  *Id.* ¶ 13.  The Lease was assigned by L&K Venture, Inc. to Jlee 19 Corp. by Assignment and Assumption of Lease Agreement, dated August 2019.  *Id.* ¶ 14.

In March 2020, the COVID-19 pandemic began spreading in New York City, quickly prompting a shutdown of businesses across industries throughout the City and State of New York.  The Second Circuit detailed the early stages of the COVID-19 crisis in New York:

> It is also undisputed that New York State was hit early and hard by the pandemic. By the end of March 2020, the state had become the nation's pandemic epicenter, reporting approximately one third of infection cases nationwide, with New York City alone then accounting for one quarter of the country's virus-related deaths.  In addition to causing a nationwide public health emergency, the pandemic fomented an economic crisis as government-mandated mitigation measures limited personal interactions and forced businesses to suspend or reduce operations.  A few statistics make the point.  In the spring of 2020, the United States experienced its sharpest economic contraction since World War II, with April 2020 unemployment numbers climbing to a record 14.4%.  In New York, between February and June 2020, the unemployment rate climbed higher still, to 20.3%, with over 1.4 million people filing for benefits.

*Melendez v. City of New York*, 16 F.4th 992, 1016 (2d Cir. 2021).

On or about March 16, 2020, after the COVID-19 pandemic hit, New York Governor Andrew Cuomo issued Executive Order 202.3 setting forth, *inter alia*, that "[a]ny restaurant or bar in the state of New York shall cease serving patrons food or beverage on-premises effective at 8 pm on March 16, 2020, and until further notice shall only serve food or beverage for off-premises consumption."  Am. Compl. ¶ 16.  On or about May 13, 2020, the City of New York enacted the Guaranty Law.  The Guaranty Law became effective on May 26, 2020.  *Id.* ¶ 17. The Guaranty Law prohibits commercial landlords from enforcing personal guarantees of eligible commercial leases for defaults that accrued between March 7, 2020, and June 30, 2021, and applies to guarantees executed before May 26, 2020.  *Id.* ¶¶ 19–20.  Only leases that met certain criteria were eligible for the protections provided by the Guaranty Law.  The protections applied, for example, to tenants "required to cease serving patrons food or beverage for on-premises consumption or to cease operation under [E]xecutive [O]rder number 202.3 issued by the governor on March 16, 2020."  *Id.* ¶ 18.  On or about April 2020, the Toasties Defendants

defaulted under the terms of the Lease and Guaranty by failing to make payment of the sums due under the Lease. *Id.* ¶ 22.

On July 12, 2021, Plaintiff commenced an action in the Supreme Court of the State of New York, Suffolk County to enforce the Lease and Guaranty. *Id.* ¶ 23. On or about November 30, 2021, the Toasties Defendants filed a motion to dismiss the state court action, based on the provisions of the Guaranty Law. *Id.* ¶ 24. The Toasties Defendants alleged that they were the operators of an establishment that offered food or beverage for on-premise consumption, and thus they were subject to the restrictions described in Governor Cuomo's Executive Order. *Id.* Accordingly, they were forced to cease their operations or cease serving customers on-premises pursuant to Governor Cuomo's Executive Order, that the default occurred during the time period covered by the Guaranty Law, and that the Guaranty Law served as a defense to the action for recovery of sums due under the Guaranty. *Id.* The state court action was subsequently voluntarily discontinued on consent of the Toasties Defendants without prejudice. *Id.* ¶ 25.

## PROCEDURAL HISTORY

Plaintiff initiated this action by filing a complaint against the City Defendant and the Toasties Defendants on April 13, 2022. Dkt. No. 1. Plaintiff served all Defendants with summonses and supporting documentation at various points from April 15, 2022, through May 12, 2022. Dkt. No. 18–23. Defendants, including the Toasties Defendants, appeared by counsel. Dkt. No. 48 ¶ 3. The City Defendant and the Toasties Defendants each filed motions to dismiss the complaint. Dkt. Nos. 34, 37. Plaintiff filed the Amended Complaint on August 10, 2022, mooting the previously filed motions to dismiss. Dkt. Nos. 40, 42, 43. The Amended Complaint includes five causes of action. They are: (1) that the Guaranty Law violates the Contracts Clause of the U.S. Constitution, Am. Compl. ¶¶ 30–51; (ii) that the Guaranty Law violates the Takings Clause of the U.S. Constitution, *id.* ¶¶ 52–66; (iii) that the Guaranty Law

violates Plaintiff's rights under the Due Process Clause of the U.S. Constitution, *id.* ¶¶ 67–73; (iv) that the Guaranty Law violates the New York Constitution and Municipal Home Law, *id.* ¶¶ 74–84; and (v) breach of contract, *id.* ¶¶ 85–91.

On August 24, 2022, the City Defendant moved to dismiss the first four counts in the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  Dkt. Nos. 44–46.  On August 26, 2022, Plaintiff filed an application for a Clerk's certificate of default against the Toasties Defendants.  Dkt. No. 48-1. On the same day, the Toasties Defendants moved both to set aside the default and to dismiss the Amended Complaint.  Dkt. Nos. 53, 56–58.  In their memorandum of law in support of their motion to dismiss, the Toasties Defendants "adopt[ed] and incorporate[d] the City's motion papers" and also argued that, if the Court dismisses the federal question claims, the Court should decline to exercise supplemental jurisdiction over the state-law claims.  Dkt. No. 58 at 2–4.  The Clerk of the Court entered a certificate of default against the Toasties Defendants on August 29, 2022.  Dkt. No. 59.

Plaintiff filed its opposition to the motions to dismiss the Amended Complaint on September 14, 2022.  Dkt. No. 60.  The City Defendant and the Toasties Defendants each filed reply memoranda of law in further support of their motions to dismiss.  Dkt. Nos. 61–62. Plaintiff did not file a response to the Toasties Defendants' motion to set aside the default.

## LEGAL STANDARD

I.   **Motion to Set Aside Clerk's Entry of a Default**

Federal Rule of Civil Procedure 55(c) provides that a party may be relieved from a clerk's entry of a default on a more relaxed standard than it may be relieved from a final default judgment.  The defaulting party need only show "good cause."  Fed. R. Civ. P. 55(c).  The Second Circuit has held that, in determining whether good cause has been shown, a district court

should weigh three "widely accepted factors": "(1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993). "Other relevant equitable factors may also be considered," including "whether the failure to follow a rule of procedure was a mistake made in good faith and whether the entry of default would bring about a harsh or unfair result." *Id.* The Second Circuit "has expressed on numerous occasions its preference that litigation disputes be resolved on the merits, not by default." *Cody v. Mello*, 59 F.3d 13, 15 (2d Cir. 1995); *see also Brien v. Kullman Indus., Inc.*, 71 F.3d 1073, 1077 (2d Cir.1995) (noting that there is a "limitation on the scope of the district court's discretion" because of the Second Circuit's "preference for resolving disputes on the merits").

## II. Motions to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555, 557. The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a

reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*,

550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

The Court first addresses the Toasties Defendants' motion to vacate the clerk's entry of

default under Federal Rule of Civil Procedure 55(c).  It then addresses the Defendants' motions

to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).

## I.       Motion to Vacate the Clerk's Entry of Default

Under Federal Rule of Civil Procedure 55(a), "[w]hen a party against whom a judgment

for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown

by affidavit or otherwise, the clerk must enter the party's default."  Here, the Clerk entered a

certificate of default against the Toasties Defendants, upon the request of Plaintiff, after the

Toasties Defendants did not file an answer or a motion to dismiss by August 24, 2022—fourteen

days after being served with Plaintiff's Amended Complaint.  Dkt. Nos. 41, 48, 52, 59.  Under

Federal Rule of Civil Procedure 15(a)(3), the Toasties Defendants had fourteen days after service

to respond to the amended pleading.

The Toasties Defendants argue that the Clerk's certificate of default against them should

be set aside because their default was not willful.  Dkt. No. 55 at 3–4.  Specifically, they note

that the docket for the case states that their answer to Plaintiff's Amended Complaint was due on

August 31, 2022.  *Id.*  As a result, they believed, in good faith, that August 31, 2022 was when

their answer or Rule 12 motion was due.  *Id.*  The Toasties Defendants also state that they filed

their motion to dismiss the original complaint by August 31, 2022, and "reached out to Plaintiff's

counsel prior to any purported default to discuss a briefing schedule for their motion to dismiss

the [A]mended [C]omplaint, but Plaintiff's counsel did not respond."  *Id.* at 4.  The Toasties

Defendants also argue that there would be no prejudice to Plaintiff from setting aside the default

at this stage of the proceedings, especially given the City Defendant timely filed its motion to dismiss the Amended Complaint, and the Toasties Defendants have filed a motion to dismiss the Amended Complaint on the same basis as the City Defendant. *Id.* at 4–5. Further, the Toasties Defendants argue that they have a meritorious defense and deserve an opportunity to have this defense be heard in front of the Court. *Id.* at 5–6. As noted, Plaintiff did not file an opposition to the Toasties' Defendants motion to set aside the certificate of default.

The Toasties Defendants have shown good cause for vacatur of the certificate of default. *See* Fed. R. Civ. P. 55(c). The Toasties Defendants' failure to respond to the Amended Complaint by August 24, 2022 does not appear to have been willful. As the Toasties Defendants note, the docket entry from the Clerk's Office misstates that an answer to the Amended Complaint was due on August 31, 2022. Dkt. No. 41. The Toasties Defendants filed their motion to dismiss the Amended Complaint within that time period—specifically, by August 26, 2022. The Toasties Defendants thus appear to have been—as they now contend—under the mistaken assumption that their actual deadline to file an answer was the deadline stated on the docket by the Clerk's Office. The promptness by which the Toasties Defendants filed their motion to set aside the entry of default is further evidence that the default was not willful. As noted, the Toasties Defendants filed their motion to set aside the entry of default the same day that Plaintiff moved for the certificate of default. Dkt. Nos. 52, 53.

Plaintiff also would not be prejudiced by the vacatur. The Toasties Defendants filed both their motion to dismiss the Amended Complaint and their motion to set aside the entry of default on August 26, 2022, only two days after the deadline under Rule 15(a)(3) had elapsed, and three days *before* the clerk entered the Certificate of Default on August 29, 2022. Dkt. Nos. 53, 56, 59. That motion to dismiss also adopted the arguments that had been made by the City

Defendant in its timely filed motion to dismiss.  Dkt. No. 58 at 2.  The only additional argument that the Toasties Defendants made in their motion to dismiss was that the Court should not exercise supplemental jurisdiction over the state-law claims in the event that all federal claims were dismissed.  *Id.* at 2–4.  The Toasties Defendants therefore had adequate time to consider and respond to the Toasties Defendants' motion to dismiss.

Finally, for the reasons discussed in Section II, *infra*, the Toasties Defendants have a meritorious defense to multiple of the causes of action alleged in the Amended Complaint, via their answer to the Amended Complaint.  In addition, as the Toasties Defendants correctly emphasize in their memorandum of law in support of the motion to vacate the certificate of default, defaults are disfavored and are meant to be used sparingly.  *See Mello*, 59 F.3d at 15.  For these reasons, the Toasties Defendants' motion to vacate the certificate of default entered by the Clerk of Court is granted.

## II.    Motions to Dismiss

The City Defendant and the Toasties Defendants independently move to dismiss the claims against them in the Amended Complaint under Rule 12(b)(6).  Dkt. Nos. 44, 56.  The City Defendant argues that the Amended Complaint fails to allege any facts establishing that the Guaranty Law is unconstitutional under Article I, Section X, Clause I of the U.S. Constitution ("Contracts Clause"), the Fifth Amendment to the U.S. Constitution ("Takings Clause"), or the Fourteenth Amendment to the U.S. Constitution ("Due Process Clause").  Dkt. No. 46 at 7–13.  The City Defendant also argues that the Guaranty Law does not conflict with the New York State Constitution or the Municipal Home Rule Law.  *Id.* at 14–16.  The Toasties Defendants adopt and incorporate the City Defendant's arguments regarding the constitutionality of the Guaranty Law and further argue that the Court should decline supplemental jurisdiction over Plaintiff's state-law claims.  Dkt. No. 58.

A.        **Contracts Clause Claim**

The Contracts Clause of the U.S. Constitution provides that "no State shall . . . pass any . . . Law impairing the Obligations of Contracts."  U.S. Const. art. 1, § 10.  "Although facially absolute, the Contracts Clause's prohibition 'is not the Draconian provision that its words might seem to imply.'"  *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 367 (2d Cir. 2006) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978)).  "Rather, courts must accommodate the Contracts Clause with the inherent police power of the state 'to safeguard the vital interests of its people.'"  *Id.* (citation omitted).  Accordingly, when courts in the Second Circuit evaluate claims under the Contracts Clause, they ask: "(1) [whether] the contractual impairment [is] substantial and, if so, (2) [whether] the law serve[s] a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) [whether] the means chosen to accomplish this purpose [are] reasonable and necessary."  *Id.* at 368.  "[W]hether [a] state law has, in fact, operated as a substantial impairment of a contractual relationship" is the threshold inquiry the Court must undertake to determine if the Guaranty Law runs afoul of the Contracts Clause.  *Allied Structural Steel*, 438 U.S. at 244; *see also Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983).

In this case, Plaintiff alleges that the City Defendant violated Plaintiff's rights under the Contracts Clause by impairing Plaintiff's right to recover under the Guaranty.  Am. Comp. ¶ 43.  Plaintiff alleges, among other things, that the Guaranty Law has substantially impaired Plaintiff's contractual obligations by permanently and forever barring Plaintiff's ability to enforce the Guaranty.  *Id.* ¶¶ 37–41.  The City Defendant moves to dismiss this claim on the basis that Plaintiff has not adequately pleaded the first factor (*i.e.*, substantial impairment) as the

10

allegations in the Amended Complaint are conclusory.  Dkt. No. 46 at 12–13.  Accordingly, the

Court focuses its analysis only on this factor.[1]

The Second Circuit recently addressed a substantially similar claim—*i.e.*, that the

Guaranty Law violated the Contracts Clause—in *Melendez v. City of New York*, 16 F.4th 992.

One of the plaintiffs in *Melendez* was a local landlord who brought a Contracts Clause claim

based on the Guaranty Law.  *Id.* at 1009.  He entered into a lease to rent a commercial space to a

business, which was subject to a "good guy" guaranty.  *Id.*  Eventually, the business-tenant failed

to meet its rent and plaintiff sought to enforce the guaranty; however, because the Guaranty Law

had permanently absolved the personal guarantor of responsibility for rent outstanding from

March 7, 2020 through September 20, 2020, he alleged that it had rendered his guaranty virtually

valueless.  *Id.*

The *Melendez* plaintiffs sought injunctive and declaratory relief, requesting that the court

invalidate the law as unconstitutional.  *Id.* at 996.  In response, the defendants filed a motion to

---

[1] In a footnote in its memorandum of law in support of its motion to dismiss, the City Defendant requested an opportunity to submit a supplemental briefing if the Court continues its analysis under the Contracts Clause beyond the first step and reaches the question of reasonableness under the third step of the test followed by the Second Circuit in *Buffalo Teachers Federation*. Dkt. No. 46 at 14 n.5.  However, the Court need not reach this issue as the City Defendant did not move to dismiss this claim on this basis.  Nor does the Court believe that it would be appropriate for it to address this claim at the motion to dismiss stage.  The Second Circuit, addressing this exact question with regard to the Guaranty Law, held that there are factual questions as to whether the Guaranty Law is "a reasonable and appropriate means to serve the City's professed public purpose" and thus this question could not be decided as a matter of law. *Melendez*, 16 F.4th at 1046.  Neither party claims that there are reasons for the Court to reach a contrary result in this case.

In its reply brief, the City of New York for the first time raises the argument that Plaintiff has not sufficiently pleaded why the "serious concerns" raised by the *Melendez* Court about the reasonableness of the Guaranty Law applies in the instant case. Dkt. No. 61 at 4 n.2.  Yet, the Court refuses to consider the merits of the City Defendant's assertion because, "[a]rguments may not be made for the first time in a reply brief."  *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993).

dismiss all claims, which the district court granted.  *Id.* at 1009.  On appeal, however, the Second

Circuit reversed and remanded the district court's dismissal of the plaintiffs' Contracts Clause

challenge to the Guaranty Law.  *Id.* at 1047.

Regarding the Contracts Clause claim, the Second Circuit held that, contrary to the

conclusion of the district court, the plaintiffs had stated a plausible Contracts Clause challenge to

the Guaranty Law.  *Id.* at 1047.  In doing so, the Circuit stated: "because the Guaranty Law

appears permanently and unexpectedly to repudiate commercial lease guaranties for arrears

arising over a sixteen-month period, we conclude that plaintiffs have plausibly alleged a

significant impairment of contract."  *Id.* at 1035.

This holding applies here.  The contract at issue in this case is substantially identical to

the contract at issue in *Melendez*.  As in *Melendez*, Plaintiff is a landlord who entered into an

agreement to lease the Premises to the Toasties Defendant.  In connection with Lease, the

Guarantors delivered to Plaintiff a Guaranty under which they personally guaranteed the

obligations under the Lease.  Am. Compl. ¶¶ 10–14.  As in *Melendez*, Plaintiff has plausibly

alleged that this contractual bargain has been "substantially undermined" by the Guaranty Law.

16 F.4th at 1033.  If the Toasties Defendants failed to pay rent owed for any time between

March 7, 2020, and June 30, 2021, as they, in fact, did, the Guaranty Law bars Plaintiff from

attempting to recover that unpaid rent from the Guarantors ever.  Thus, Plaintiff plausibly alleges

that "[t]his substantially undermines the [Plaintiff's] contractual bargain, interferes with [its]

reasonable expectations, and prevents [it] from safeguarding or ever reinstating rights to which

[it] was entitled during a sixteen-month period."  *Id.*

The City Defendant nonetheless attempts to avoid the holding of *Melendez* by arguing

that the allegations of substantial impairment contained in the Amended Complaint are "wholly

conclusory" unlike those of the plaintiffs in *Melendez*.  Dkt. No. 46 at 13.  The City Defendant argues that Plaintiff relies only on language "cherry-pick[ed]" from the Second Circuit's opinion in *Melendez* and does not provide any factual allegations to support its conclusion.  *Id.* Specifically, the City Defendant claims that Plaintiff fails to "describe the nature of its contractual relationship with the guarantor, . . . [or] allege the guaranty is an indispensable part of the Plaintiff's business," and does not support its conclusions that the Guaranty Law has disrupted its reasonable expectations under the Lease and Guaranty and rendered the Guaranty valueless.  *Id.*

Although it is true that the allegations in the Amended Complaint are sparse, they are not insufficient to plausibly allege substantial impairment of a contractual right.  The Amended Complaint describes Plaintiff's contractual relationship with the Guarantor.  As noted, it states: "Defendants JIN CHOI, MATTHEW AHN and RAYMOND KIM executed and delivered to Plaintiff a Guaranty dated May 15, 2014 [ ], whereby said Defendants personally guaranteed the obligations under the said Lease."  Am. Compl. ¶ 13.

The Amended Complaint also proffers allegations to support Plaintiff's claim that its reasonable expectations under the Guaranty have been upended and that it has been prevented from safeguarding or reinstating its rights.  *See Melendez*, 16 F.4th at 1033.  Plaintiff alleges that on or about April 2020, the Toasties Defendants defaulted under the terms of the Lease and Guaranty, by failing to make payments of the sums due under the Lease, Plaintiff commenced a state court action to enforce the Lease and Guaranty, and the action was voluntary discontinued after the Toasties Defendants filed a motion to dismiss the state court action based on the Guaranty Law.  Am. Compl. ¶¶ 22–25.  According to Plaintiffs, they have been damaged by the Guaranty Law in the sum of $1,000,127.27, money that they may not be able to recover.  *Id.*

¶¶ 27, 49; *see Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 439 (1934) (holding that while a state may impose temporary restraints on enforcement of debts, it may not "adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them"). Plaintiff also alleges that the Guaranty was entered "into well in advance of the Guaranty Law," implying that when it entered into the Guaranty and Lease, it had every expectation of being able to enforce its rights thereunder. Am. Compl. ¶ 28.

That Plaintiff did not plead anything concerning its inability to collect this unpaid rent from the tenant under the Lease, apart from the Guaranty, is unavailing at this stage. The Second Circuit rejected this argument in *Melendez*, 16 F.4th at 1033. The court noted: "the law recognizes a secured obligation to establish effectively two contractual bargains, one between the principals and the other between a principal and the guarantor. So here, there is one contractual bargain between landlord and tenant and another contractual bargain between landlord and guarantor." *Id.* at 1034. In holding that the complaint should not have been dismissed at the pleadings stage, the Circuit continued:

> The fact that the Guaranty Law does not invalidate the first bargain cannot gainsay its destruction of the second for guarantor obligations arising between March 7, 2020, and June 30, 2021. The law effectively repudiates those guarantor debts, rendering them permanently and completely unenforceable. This is certainly a substantial impairment of contract.

*Id.*[2]

---

[2] Although the Second Circuit based its decision in *Melendez*, in part, on allegations that plaintiffs "will not rent commercial space to small businesses without the security of a personal guaranty," 16 F.4th at 1034, the Second Circuit's decision did not turn on that allegation. Instead, the focus of the Circuit's conclusion that the plaintiffs in *Melendez* had plausibly alleged a substantial impairment was that the Guaranty Law effectively abolished debts and made them "permanently and completing unenforceable." *Id.* The absence of a similar allegation by Plaintiff here concerning the importance of personal guarantees to its business is not fatal at this stage to its Contracts Clause claim.

Analyzing the Guaranty as a stand-alone contract, Plaintiff plausibly alleges that the Guaranty's sole purpose (to provide Plaintiff a remedy to collect against a possible default on the Lease) was effectively voided for arrears arising over a sixteen-month period via the Guaranty Law. As a result, Plaintiff has pleaded that it suffered a substantial impairment of the contract that it reached with the Toasties Defendants. The Court therefore denies the Defendants' motions to dismiss this claim.

### B.   Takings Clause Claim

The City Defendant also moves to dismiss Plaintiff's claim that the Guaranty Law violates the Takings Clause of the Fifth Amendment. *See* Dkt. No. 46 at 8–10. Plaintiff's Takings Clause claim alleges that the City of New York, by enacting the Guaranty Law, sought to take Plaintiff's property in the form of the Guaranty. Am. Compl. ¶¶ 52–66. Plaintiff states that "[t]he Guaranty Law amounts to the complete elimination of value and total loss of the Guaranty." *Id.* ¶ 57. In moving to dismiss, the City Defendant argues that Plaintiff misconstrues the scope of the Guaranty Law in alleging that it amounts to a complete elimination of the value and total loss of the Guaranty. Dkt. No. 46 at 8–9. It notes that the Guaranty Law does not completely eliminate the value of the Guaranty or of Plaintiff's lease but only prevents enforcement of personal guaranties as to debts that accrued during a limited time period. *Id.* It also leaves the underlying debt intact and thus only limits one avenue of recovery. *Id.* The City Defendant also states that Plaintiff's allegations are conclusory. *Id.* at 9.

That Plaintiff has stated a plausible Contracts Clause claim does not mean that Plaintiff has pleaded a Takings Clause claim. The Contracts Clause is applicable directly to the states and was "prompted, in large part, by a post-Revolutionary War economic crisis," in which "states, in trying to afford relief to beleaguered small debtors, enacted legislation repudiating pre-existing debt obligations." *Melendez*, 16 F.4th at 1017. Its language is seemingly absolute: "No State

shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1;

*see Melendez*, 16 F.4th at 1018 ("[N]o qualifier tempers the Contracts Clause; its proscriptive

language is absolute.").  Plaintiff's Contracts Clause claim therefore seemingly reads directly

onto the central concern of Article I, Section 10, clause 1:  according to Plaintiff, a subdivision of

the state has enacted legislation that has the effect of repudiating a pre-existing debt obligation.

By contrast, Plaintiff's Takings Clause claim is more attenuated from the central concerns of that

constitutional provision.  "The original understanding of the Takings Clause of the Fifth

Amendment" was that while the "clause required compensation when the federal government

physically took private property," it did not apply "when government regulations limited the

ways in which property could be used" and thereby reduced its value.  William Michael Treanor,

*The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev.

782, 782 (1995); *see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535

U.S. 302, 321–22 (2002).  In other words, prior to 1922, the "Takings Clause was understood to

provide protection only against a direct appropriation of property—personal or real."  *Horne v.

Dep't of Agric.*, 576 U.S. 350, 360 (2015).  The Takings Clause on its face applies when "private

property [is] taken for public use, without just compensation."[3]  U.S. Const. amends. V, XIV, §

1.

     The Supreme Court has long since held that the Takings Clause may apply based on a

"'regulatory taking'—a restriction on the use of property that went 'too far.'"  *Horne*, 576 U.S. at

360 (quoting *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415 (1922)).  But the Supreme

Court has repeatedly cautioned against an expansive understanding of this concept.  Specifically,

---

[3] The Takings Clause was also not applied against the states until the passage of the Fourteenth
Amendment.  *See Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 239 (1897).

it has stated "[i]n the course of regulating commercial and other human affairs, Congress routinely creates burdens for some that directly benefit others." *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 223 (1986). Thus, "it cannot be said that the Takings Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another." *Id.* The result would be to turn "government regulation into a luxury few governments could afford." *Tahoe Reg'l Plan. Agency*, 535 U.S. at 324. As the Supreme Court again put it in *Adrus v. Allard*:

> Suffice it to say that government regulation—by definition—involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by purchase. "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."

444 U.S. 51, 65 (1979) (quoting *Pennsylvania Coal Co.*, 260 U.S. at 413). Accordingly, the Supreme Court has stated that "a party challenging governmental action as an unconstitutional taking bears a substantial burden." *E. Enterprises v. Apfel*, 524 U.S. 498, 523 (1998). In determining whether a regulatory taking has occurred, courts focus their analysis on whether the regulation effects something similar in kind to a physical taking. *See Penn Cent. Transp. Co.*, 438 U.S. at 124 ("A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." (cleaned up)); *see also Tobe*, 464 F.3d at 375 ("Nothing is affirmatively taken by the government. Instead the government annul[ed] something," which is "uncharacteristic of a regulatory taking.").

This case, of course, does not involve a physical taking. Plaintiff does not claim that the Guaranty Law took its physical property—*i.e.*, a portion of its Premises. Plaintiff retained

physical title to the Premises throughout the period of the Guaranty Law and continued to retain that title at least up until the time that the Amended Complaint was filed.  Instead, Plaintiff claims that the Guaranty Law deprived it of the benefit of a portion of the stream of income that it was expecting in the future from its ownership of the Premises and gave the benefit of that stream of income to the Guarantors who were relieved of the contingent obligation to pay it to Plaintiff.  The Guaranty Law also does not empower the government to "directly appropriat[e] private property for its own use." *Tobe*, 464 F.3d at 374 (citation omitted) (stating that the "fact of a taking is fairly obvious in physical taking cases [where] for example, the government might occupy or take over a leasehold interest for its own purposes or the government might take over a part of a rooftop of an apartment building").  There is no allegation that the government "t[ook] over" Plaintiff's interest in the Guaranty for "its own purposes." *Id.*  On its face, the Guaranty Law effects the adjustment of rights for what is asserted to be the public good—at the expense of the landlord to the benefit of the Guarantors. *See Adrus*, 441 U.S. at 65.

Plaintiff also has not plausibly alleged a regulatory taking.  "Regulatory takings analysis requires an intensive ad hoc inquiry into the circumstances of each particular case." *Tobe*, 464 F.3d at 375.  To determine whether a regulatory interference with property rises to the level of a regulatory taking, courts apply the framework laid out in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 123 (1978).  As part of that framework, courts "weigh three factors to determine whether the interference with property rises to the level of a taking: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Sherman v. Town of Chester*, 752 F.3d 554, 565 (2d Cir. 2014) (quoting *Tobe*, 464 F.3d at 375).  No single factor is dispositive, although the last factor is generally

treated as the most important.  *See Gray Gables Corp. v. Arthur*, 2022 WL 905393, at *3 (2d Cir. Mar. 29, 2022) (summary order); *Our Wicked Lady LLC v. Cuomo*, 2021 WL 915033, at *6 (S.D.N.Y. Mar. 9, 2021); *Lebanon Valley Auto Racing Corp. v. Cuomo*, 478 F. Supp. 3d 389, 402 (N.D.N.Y. 2020).

The Supreme Court considered a similar question to that presented here in *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211.  There, plaintiff challenged on Takings Clause grounds a provision the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), which required employers withdrawing from a multiemployer pension plan to pay a fixed and certain debt to the pension plan.  *Id.* at 217.  Plaintiff claimed that the law "took" the employers' bargained-for contractual right, reflected in collective bargaining agreements and a trust agreement, limiting the contributions they would have to make in order to withdraw.  *Id.* at 217–18.  In effect, the law took an asset from the employers—funds the employers otherwise had a contractual right to enjoy and to which the plan had no pre-existing right—and transferred them to the plan.

The Supreme Court nonetheless rejected the claim of the trustees of a multiemployer pension fund that the MPPAA took property without proper compensation within the meaning of the Takings Clause.  *Id.* at 219.  The Supreme Court stated that while the MPPAA resulted in a permanent deprivation of property, "it cannot be said that the Takings Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another."  *Id.* at 222–23.  The Court noted: "[O]ur cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. . . .  This is true even though the effect of the legislation is to impose a new duty or liability based on past acts."  *Id.* at 223 (citation omitted).

19

Importantly, the Court continued: "Appellants' claim of an illegal taking gains nothing from the fact that the employer in the present litigation was protected by the terms of its contract from any liability beyond the specified contributions to which it had agreed." *Id.*  The Court continued that: "Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity.  Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them." *Id.* at 223–24.  The Court thus concluded that "[i]f the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions," and for the same reasons, "the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking." *Id.* at 224.  The Court added the caveat:

> This is not to say that contractual rights are never property rights or that the Government may always take them for its own benefit without compensation.  But here, the United States has taken nothing for its own use, and only has nullified a contractual provision limiting liability by imposing an additional obligation that is otherwise within the power of Congress to impose.  That the statutory withdrawal liability will operate in this manner and will redound to the benefit of pension trusts does not justify a holding that the provision violates the Taking Clause and is invalid on its face.

*Id.*

The Court further based its decision on an analysis of the governmental action in light of the three *Penn Central* factors, stating that "[e]xamining the MPPAA in light of these factors reinforces our belief that the imposition of withdrawal liability does not constitute a compensable taking under the Fifth Amendment." *Id.* at 225.  As to the nature of the governmental action, the Court noted that:

> the Government does not physically invade or permanently appropriate any of the employer's assets for its own use.  Instead, the [MPPAA] safeguards the participants in multiemployer pension plans by requiring a withdrawing employer to fund its share of the plan obligations incurred during its association with the plan.

> This interference with the property rights of an employer arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under our cases, does not constitute a taking requiring Government compensation.

*Id.* The Court also noted that the other two factors did not weigh in favor of a taking. *Id.* at 225–26. With respect to the second factor, the Court recognized that "the [MPPAA] completely deprives an employer of whatever amount of money it is obligated to pay to fulfill its statutory liability," but held that that was not sufficient to support a taking because "[t]here is nothing to show that the withdrawal liability actually imposed on an employer will always be out of proportion to its experience with the plan, and the mere fact that the employer must pay money to comply with the [MPPAA] is but a necessary consequence of the MPPAA's regulatory scheme." *Id.* The Court held that the third factor also did not support a taking because "[p]rudent employers . . . had more than sufficient notice not only that pension plans were currently regulated, but also that withdrawal itself might trigger additional financial obligations," and thus could not claim to be surprised when the government took additional action to achieve its legislative ends. *Id.* at 227.

The Supreme Court's decision in *Connolly* largely forecloses Plaintiff's Takings Clause claim. As in *Connolly*, Plaintiff's Takings Clause claim is premised on interference with its contractual rights. Plaintiff claims that the Guaranty Law nullified its rights under the Guaranty by preventing it from seeking to enforce debts against the Guarantors for unpaid rent occurred during a specific time period. However, *Connolly* holds that "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." *Id.* at 223 (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15–16 (1976)). The government may effect a taking and owe just compensation when it takes a contract right "for its own benefit without compensation" or "for its own use." *Id.* at 224. But it generally does not effect a taking

21

when it "has nullified a contractual provision." *Id.* Other constitutional provisions protect against such action.[4]

The conclusion that Plaintiff has not stated a Takings Clause claim is further supported here, as it was in *Connolly*, by the *Penn Central* factors. As to the first factor, the Amended Complaint alleges that "[t]he economic impact of the Guaranty Law on Plaintiff is severe, in that the Guaranty Law completely and permanently destroys Plaintiff's ability to recover the rent due from the personal guarantors under the Guaranty." Am. Compl. at ¶ 60. However, in making this argument, Plaintiff defines the "property" that it alleges was unlawfully taken without just compensation too narrowly. The Supreme Court has instructed that, in analyzing the first factor, courts should not "divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." *Penn Cent. Transp. Co.*, 438 U.S. at 130–31. To do so would be to presuppose the answer to the very question to which the first factor poses: if property under the Takings Clause was defined by the interest that was affected by governmental action, then every law that adjusted a citizen's rights could be viewed as having effected a taking. *See Murr v. Wisconsin*, 137 S. Ct. 1933, 1944 (2017) (stating that how the property interest is defined for purposes of this inquiry "may be outcome determinative"). Instead, "[i]n deciding whether a particular governmental action has effected a taking," the court must focus "on the nature and extent of the interference with rights in the parcel as a whole." *Id.* That is because "[p]hysical takings are characterized by a deprivation of the 'entire bundle of property rights' in the affected property interest—'the rights to possess, use and dispose of' it." *Cmty. Hous. Improvement Program v. City of New York*, 492 F. Supp. 3d 33, 43 (E.D.N.Y.

---

[4] Tellingly, the Court reached its conclusion in *Connolly* notwithstanding that the Contracts Clause only applies to the states. U.S. Const. art. I, § 10, cl. 1. Here, Plaintiff has that additional protection against what it claims is unlawful state conduct.

2020), *aff'd*, 59 F.4th 540 (2d Cir. 2023), *and aff'd sub nom. 74 Pinehurst LLC v. New York*, 59 F.4th 557 (2d Cir. 2023) (citation omitted).

The Supreme Court's decision in *Allard*, 444 U.S. 51, is instructive.  In that case, plaintiffs who were engaged in the trade of Indian artifacts challenged statutes and regulations prohibiting commercial transactions in certain bird parts.  *Id.* at 54.  A number of plaintiffs' artifacts were composed of the feathers of currently protected birds; certain of the plaintiffs tried to sell some of their preexisting artifacts and were prosecuted under the relevant statutes.  *Id.* They then brought suit alleging that the statutes and regulations violated the Takings Clause. *Id.* at 55.

The Supreme Court disagreed, holding that the fact that the statutes wholly deprived plaintiffs of the opportunity to sell the artifacts did not violate the Fifth Amendment.  *Id.* at 64. The Court noted:  "government regulation—by definition—involves the adjustment of rights for the public good.  Often this adjustment curtails some potential for the use or economic exploitation of private property.  To require compensation in all such circumstances would effectively compel the government to regulate by purchase."  *Id.* at 65.  The Court continued that the "regulations challenged here do not compel the surrender of the artifacts, and there is no physical invasion or restraint upon them.  Rather, a significant restriction has been imposed on one means of disposing of the artifacts."  *Id.*  However, the Court noted that this was not sufficient to state a Takings Clause claim.  Specifically, the Court stated:  "the denial of one traditional property right does not always amount to a taking.  At least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety."  *Id.* at 65–66.  The Court was also not swayed by the fact that the regulations prevented the most profitable use of the property, noting,

"[w]hen we review regulation, a reduction in the value of property is not necessarily equated with a taking." *Id.* at 66.

Here, as in *Allard*, even if the Guaranty Law effectively destroyed Plaintiff's rights to recover from the Guarantors the rent payments that the tenant refused or was unable to pay for the period of time covered by that law, that was only one of the bundle of rights Plaintiff enjoys by virtue of its ownership of the Premises.   There is no allegation that the Guaranty Law interferes with Plaintiff's rights to enjoy any of the other property rights related to its ownership of the Premises—and its ability to derive income therefrom.   The Plaintiff can still, for example, attempt to recover past due rent from the tenant, its primary obligator under the Lease.   *See Park Towers S. Co., LLC v. 57 W. Operating Co.*, 945 N.Y.S.2d 554 (1st Dep't 2012) ("Thus, landlord correctly further asserts that the fact that the guarantors' liability may have been 'cut off' by virtue of their giving 'vacate date' notice under the 'good guy' provisions of the respective guaranties, and the tenant's subsequent vacatur of the premises, do not limit tenant's exposure for unpaid rent.").   The Guaranty Law does not discharge the underlying debt.   Plaintiff also can avail itself of any of the other remedies provided under city law for landlords, none of which it challenges here.   And, even if Plaintiff were unable to recover past due rent from the tenant either directly or in, for example, a bankruptcy proceeding,[5] the deprivation of that economic benefit is temporally limited.   The Guaranty Law only prevents Plaintiff from enforcing its right

---

[5] In *Melendez*, the Circuit noted that "the practical likelihood of landlords . . . recovering rent arrears from delinquent small business tenants appears speculative at best," including because "commercial tenants . . . are frequently corporate entities, which can dissolve and/or use bankruptcy to avoid accumulated rent indebtedness."  16 F.4th at 1033.  But, here, Plaintiff does not allege that it is unlikely to collect unpaid rent from the tenant.  It is also clear that the tenant has not filed for bankruptcy, as it is a party to this action and there is no automatic stay in place in this case under 11 U.S.C. § 362.  Moreover, even if the tenant did file for bankruptcy, that filing would not necessarily foreclose the Plaintiff from recovering from the bankruptcy estate (albeit the recovery may not be in full).

under the Guaranty for defaults that occurred during an approximately sixteen-month period.  It

has absolutely no impact on Plaintiff's ability to enforce its rights under this Guaranty or any

other guaranty at a future point.  It thus is not different in kind from a wage freeze or a shutdown

order, each of which may have the effect of depriving a property owner from fully realizing the

economic benefits of its property for a limited period of time, but none of which, when done for

a public purpose, have been viewed as susceptible on their own to a Takings Clause challenge.

*See Tobe*, 464 F.3d at 375 (finding that severity of economic impact of wage freeze did not

weigh in favor of Takings Clause claim because "[t]he wage freeze is temporary and operates

only during a control period"); *Bimber's Delwood, Inc. v. James*, 496 F. Supp. 3d 760, 784

(W.D.N.Y. 2020) (finding plaintiffs were unlikely to succeed on their takings claim because, in

part, "the Executive Orders are temporary and do not preclude all economic use of Plaintiffs'

property").  Had Plaintiff retained operation of the Premises and run an establishment offering

food or beverages for on-premises consumption, Plaintiff—rather than the Toasties

Defendants—would have been limited in the extent they could have fully exploited their

property.  Plaintiff might well have lost the same income they claim to have lost by virtue of

being unable to enforce the Guaranty.  But, no one claims that such limited deprivation of the

right to exploit the Premises would have effected a taking.  Viewing Plaintiff's bundle of

property rights "in [their] entirety," *Allard*, 444 U.S. at 66, this factor does not weigh in favor of

a taking.  *Cf. Sherman*, 752 F.3d at 565 (finding factor weighed in favor of taking where "the

Town's actions effectively prevented Sherman from making any economic use of his property").

As to the second factor, Plaintiff does not sufficiently allege that "the regulation has

interfered with distinct investment-backed expectations."  *Penn Cent. Transp. Co.*, 438 U.S. at

124.  The second factor looks to a plaintiff's reasonable expectations at the time of purchase and

whether they have been thwarted and does not look to the value of the property at the time of the alleged taking. *See 74 Pinehurst LLC*, 59 F.4th at 567. The reasonableness standard "ensures that compensation is limited to those owners who can demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Id.* "[T]he critical time for considering investment-backed expectations is the time a property is acquired, not the time the challenged regulation is enacted." *Id.* (quoting *Meriden Tr. & Safe Deposit Co. v. F.D.I.C.*, 62 F.3d 449, 454 (2d Cir. 1995)).

The Amended Complaint's allegations as to this element are largely conclusory. The Amended Complaint uses the term "investment-backed expectations" only once to allege that "[t]he Guaranty Law has interfered with distinct investment-backed expectations of Plaintiff, which is the beneficial party under the Guaranty, as it completely and permanently prevents recovery by the Plaintiff under the Guaranty." Am. Compl. ¶ 61. The Amended Complaint does not provide any further detail as to how the passage of the Guaranty Law has interfered with its reasonable investment-backed expectations, or detail what exactly those investment-backed expectations were. The allegations do not satisfy the *Twombly/Iqbal* standard. *See Greenport Gardens, LLC v. Vill. of Greenport*, 2021 WL 4480551, at *12 (E.D.N.Y. Sept. 30, 2021) ("By omitting discussion of investment-backed expectations, the pleading fails to [allege plausibly] a taking under this factor." (quoting *Lebanon Valley Auto Racing Corp.*, 478 F. Supp. 3d at 401)).

Furthermore, Plaintiff has not plausibly alleged that it "bought [its] property in reliance on a state of affairs that did not include the challenged regulatory regime." *74 Pinehurst LLC*, 59 F.4th at 567. When Plaintiff purchased the Premises, it purchased a form of property that had clearly been "the object[t] of legislative concern." *Connolly*, 475 U.S. at 226. "[L]andlords understand that the contractual right to collect rent is conditioned on compliance with a variety

of state laws, their reasonable investment-backed expectations cannot extend to absolute freedom from 'public program[s] adjusting the benefits and burdens of economic life to promote the common good.'" *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 167 (S.D.N.Y. 2020) (citation omitted).  Landlords are aware, for example that the government, may enact zoning regulations, permitting some form of commercial use and preventing other forms of commercial use, the effect of which may to enhance or diminish the economic value of the property. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027–28 (1992) (stating that in light of "the State's traditionally high degree of control over commercial dealings," a landlord "ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale)").  The mere consideration of such regulations could have the effect, for a moment in time, of depriving the owner of what (in the absence of some consideration) might be the full economic value of its property.  Landlords also understand that the government may pass "health, safety, morals, or general welfare measures," further limiting the way that the property may be used. *Penn Central Transp. Co.*, 438 U.S. at 125.  Each of those types of regulations might interfere with the ability of the owner to exploit the full value of its property, but all of them would have been understood as risks at the moment the property was acquired.  Such regulations—if designed to promote the public good— are also "viewed as permissible governmental action" and generally do not constitute takings unless they have "the same effect as the complete destruction of rights." *Id.* at 127–28.

Viewed from that perspective, it cannot be said that the Guaranty Law—a law concerning the "general welfare" and passed ostensibly to benefit the community at the temporary expense of the landlord—would have so interfered with the reasonable investment-backed expectations of

the landlord to effect a taking.  At the time of purchase of the Premises, Plaintiff may not have

anticipated the precise nature of the instant regulation and its impact on guaranty-rights

specifically.  Few could have foreseen the COVID-19 pandemic and the need for the laws and

regulations it brought into force.  In a changing world, it is impossible to anticipate every public

exigency that would call for government action.  But that does not mean that the Guaranty Law

undermines Plaintiff's investment-backed expectations sufficient to give rise to a Takings Clause

claim.  At the time of its investment, a landlord such as Plaintiff could have anticipated that the

future might bring public health, safety, morals, or general welfare measures that would disrupt

its ability to exploit the full value of the Premises as a commercial property over some limited

time.[6]  It is irrelevant that Plaintiff could not have anticipated the precise form that such

measures ended up taking.

---

[6] This conclusion is not inconsistent with the Second Circuit's rejection in *Melendez* of the
proposition that the Guaranty Law did not interfere with the plaintiff's reasonable expectations
because "New York has sometimes, and to varying degrees, regulated its commercial real estate
market."  16 F.4th at 1034.  The Court stated:  "Nothing in the pleadings record suggests that
such regulation has ever pertained to personal guaranties so as to alert New York commercial
landlords, prior to the pandemic, to the possibility of state action in that regard."  *Id.*  The Circuit
reached that conclusion in the context of a Contracts Clause claim where the relevant question
was whether the party's "reasonable expectations *under the contract* have been disrupted."  *Id.* at
1033 (citation omitted) (emphasis added).  It thus made sense to look at the precise nature of past
and existing commercial real estate regulations and whether it would be reasonable for the
plaintiffs to believe that similar regulations could affect their particular contracts.  To hold
otherwise would give the government license to abrogate any contractual right on the grounds
that some other contractual rights have had a history of being impaired.  For purposes of the
Takings Clause, however, the inquiry is different.  The court must instead discern whether the
government action has interfered with the party's *investment-backed expectations* in the
property.  *See Penn Cent. Transp. Co.*, 438 U.S. at 124.  Indeed, in *Connolly* itself, the Court did
not look to whether there was a history of interfering with the contract rights of contributing
employers to withdraw from a multi-employer pension plan but rather whether the effect of the
regulation was to undermine the economic expectations of the employer in entering into that
plan.  475 U.S. at 227.  Similarly, the relevant question here is whether the Guaranty Law upset
the expectations of the landlord to be able to exploit the Premises.

28

Furthermore, even if this factor, sufficiently pleaded, did support this claim, it would be outweighed by the other two remaining factors. *See, e.g.*, *Our Wicked Lady LLC*, 2021 WL 915033, at *6 (stating that although "the challenged orders have undoubtedly interfered greatly with the plaintiffs' financial expectations," "[a]ctions like those taken through these orders, which are undertaken to address a global pandemic, do not constitute a regulatory taking"); *cf. Arthur*, 2022 WL 905393, at *3 (holding that even though plaintiff had alleged that the condemnation had an adverse economic impact on itself, plaintiff had failed to allege a Takings Clause violation).

The final *Penn Central* factor (and the first analyzed by *Connolly*) is an analysis of the character of the governmental action being challenged by a plaintiff. This factor also weighs against a taking. The interference effected by the Guaranty Law "adjusts the benefits and burdens of economic life to promote the common good." *Connolly*, 475 U.S. at 225. Moreover, the Second Circuit has stated that a "negative restriction rather than an affirmative exploitation by the state" weighs against the finding of a taking as "[n]othing is affirmatively taken by the government" but instead the "government annuls something." *Tobe*, 464 F.3d at 375. Thus, in *Buffalo Teachers Federation v. Tobe*, the court upheld the district court's determination that a wage freeze law did not constitute a taking, stating: "Nothing is affirmatively taken by the government. Instead the government annuls something—namely, the appellants' contractual right to a wage increase. The freeze is in this respect like a temporary cap on how much plaintiffs may charge for their services." *Id.* Here, too, the nature of the government action at issue (the Guaranty Law) does not involve anything being taken by the government. Instead, the government merely annulled the right of the Plaintiff to enforce unpaid rents against one of two obligors for a limited period of time. *See Arthur*, 2022 WL 905393, at *3 (holding that a

restriction that is only "temporary" weighs against finding a taking).  "[T]he nature of the state's action is [therefore] uncharacteristic of a regulatory taking," *Tobe*, 464 F.3d at 375, and accordingly this factor "weighs heavily against finding a taking," *Arthur*, 2022 WL 905393, at *3.

Plaintiff alleges that the Guaranty Law "clearly eliminated Plaintiff's contract rights for the proclaimed public purpose of keeping the Toasties Defendants' business open, despite the fact that it did not accomplish that purpose," Am. Compl. ¶ 62, and that the Guaranty Law "seeks to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit upon guarantors of commercial leases," *id.* at ¶ 56.  But similar accusations could be levelled by the disadvantaged party against any law "that adjusts the benefits and burdens of economic life" ostensibly "to promote the common good."  *Connolly*, 475 U.S. at 225.  There will be a loser and that loser will always be free to claim that the law did not actually further the common good but just effected a transfer of wealth.  The lesson of *Penn Central* and *Connolly*, however, is that the fact that a law effects such a transfer is not license for a court to second-guess the judgments of an elected legislature.  Those issues generally are to be ironed out through the political process.

There is also no "success" metric under the third factor of the *Penn Central* test.  The constitutional analysis does not turn on the success of the Guaranty Law in keeping the Toasties Defendants' business open and/or operating.  Even if it were open to the Court to pass such a judgment on the City's legislation, Plaintiff does not allege facts that would support its claim. To the contrary, when the Second Circuit conducted its Contracts Clause analysis in *Melendez* to determine if the Guaranty Law served a significant and legitimate purpose, the Second Circuit panel found evidence of a forward-looking public purpose that contemplated the regulation's

impact on promoting *new businesses* rather than keeping open existing ones.  The *Melendez* court cited New York City Council Member Carlina Rivera's April 29, 2020 statement explaining why she was sponsoring the Guaranty Law:

> [to] ensure that business owners, should they be forced to walk away or temporarily shutter their stores, through no fault of their own[,] can do so without facing personal liability, *ensuring that one day they may be able to return and relaunch or create a new thriving business in our neighborhoods.*

*Melendez*, 16 F.4th at 1036 (emphasis in original).

The Court is thus "not persuaded" that, even if a valid property interest has been stated, Plaintiff has "met the heavy burden necessary to establish a regulatory taking."  *Tobe*, 464 F.3d at 375.  Accordingly, Plaintiff's Takings Clause claim must be dismissed.

### C.     Due Process Clause Claim

Plaintiff's final cause of action under the U.S. Constitution is for a violation of its Due Process Clause rights.  Plaintiff alleges that the Guaranty Law "violated Plaintiff's rights under the Due Process Clause by completely and permanently depriving Plaintiff of a cause of action to recover on the Guaranty."  Am. Compl. ¶ 69.  It is unclear whether Plaintiff is asserting a substantive or procedural due process claim, so the Court addresses both.

### 1.     Procedural Due Process

The City Defendant moves to dismiss this claim arguing that while a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause, the Guaranty Law does not prevent Plaintiff from accessing the Court to have its claims heard but merely serves as a defense to enforceability of personal guaranties.  Dkt. No. 46 at 10–11.  The City Defendant further notes that the legislative process—under which the Guaranty Law was passed—constitutes all of the process that was due.  *Id.* at 11.

31

The U.S. Constitution provides "[n]o person shall . . . be deprived of life, liberty or property, without due process of law." U.S. Const. amend. V. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests, by requiring the Government to provide some sort of procedural protections when a deprivation occurs." *Seidemann v. Pro. Staff Cong. Loc. 2334*, 432 F. Supp. 3d 367, 388 (S.D.N.Y. 2020), *aff'd sub nom. Seidemann v. Pro. Staff Cong. Loc. 2334, Am. Fed'n of Tchrs. AFL-CIO*, 842 F. App'x 655 (2d Cir. 2021) (cleaned up). "To succeed on a procedural due process claim, 'a plaintiff must first identify a property right, second show that the state has deprived him [or her] of *that* right, and third show that the deprivation was effected without due process.'" *Elmsford Apartment Assocs., LLC*, 469 F. Supp. 3d at 172 (quoting *Progressive Credit Union v. City of New York*, 889 F.3d 40, 51 (2d Cir. 2018)).

"Typically, procedural due process requires that 'a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *New York Pet Welfare Ass'n, Inc. v. City of New York*, 143 F. Supp. 3d 50, 70 (E.D.N.Y. 2015), *aff'd*, 850 F.3d 79 (2d Cir. 2017) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)). However, "[o]fficial action that is legislative in nature is not subject to the notice and hearing requirements of the due process clause." *Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 142 (2d Cir. 1994). "When the legislature passes a law which affects a general class of persons, those persons have all received procedural due process—the legislative process." *Yusov v. Martinez*, 2000 WL 1593387, at *4 (S.D.N.Y. Oct. 24, 2000) (quoting *Oklahoma Education Assoc. v. Alcoholic Beverage Laws Enforcement Comm'n*, 889 F.2d 929, 936 (10th Cir. 1989)).

Plaintiff has not stated a valid procedural due process claim.  Even assuming that Plaintiff
has stated a claim that he was deprived of a valid property right, this deprivation was effected
with due process.  The parties do not dispute that the Guaranty Law was a legislative action and
not a "proceeding[] designed to adjudicate disputed facts in particular cases."  *United States v.
Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973).  Plaintiff therefore has received all of the
process that it was due—*i.e.*, the legislative process.

Plaintiff nonetheless appears to point to the Supreme Court's decision in *Logan v.
Zimmerman Brush Co.*, 455 U.S. 422 (1982), to argue that it does have a valid Due Process
Clause claim.  In *Logan*, the plaintiff brought an administrative claim against his employer under
an Illinois state law barring employment discrimination on the basis of physical handicap.
However, after the state commission, which was established to adjudicate complaints under the
Illinois law, failed to hold a timely conference in compliance with statutory procedural
requirements, the employer moved to dismiss the complaint.  *Id.* at 426–27.  In response, the
plaintiff argued that "terminating his claim because of the Commission's failure to convene a
timely conference—a matter beyond [plaintiff's], or indeed the company's, control—would
violate his federal rights to due process and equal protection of the laws."  *Id.*  The Court agreed
with Plaintiff holding that "a cause of action is a species of property protected by the Fourteenth
Amendment's Due Process Clause," *id.* at 428, and thus Plaintiff was entitled to "*some* form of
hearing" prior to deprivation of that interest, *id.* at 433 (emphasis in original).

The Court, however, made clear that its holding was specific to "procedural" limitations
imposed by statute on a person's ability to assert his cause of action in court.  *Id.* at 433.  The
Court stated:  "the Fourteenth Amendment's Due Process Clause has been interpreted as
preventing the States from denying potential litigants use of established adjudicatory procedures,

when such an action would be 'the equivalent of denying them an opportunity to be heard upon their claimed right[s].'" *Id.* at 429–30 (citation omitted).  The Court noted that this followed from the fact that "minimum [procedural] requirements [are] a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action." *Id.* at 432 (quoting *Vitek v. Jones*, 445 U.S. 480, 491 (1980)).  The Court further clarified that its decision should not be read to prohibit states from imposing substantive limitations on a party's cause of action.  *Id.* at 433.  The Court stated:  "the State remains free to create substantive defenses or immunities for use in adjudication" and, in such a case "the legislative determination provides all the process that is due."  *Id.* at 432–33.

With this background, it is clear that the Court's holding in *Logan* does not apply to the instant case.  The Guaranty Law did not impose procedural limitations that barred Plaintiff from "present[ing] [its] case and hav[ing] its merits fairly judged."  *Logan*, 455 U.S. at 433.  In fact, Plaintiff did bring an action against the Toasties Defendants in state court, which it voluntarily discontinued.  Am. Compl. ¶ 25. Instead, the Guaranty Law establishes a substantive defense to a claim by a landlord against certain types of guarantors for a specific time period.  *Logan*'s holding therefore does not save Plaintiff's due process claim.

## 2.    Substantive Due Process

To the extent Plaintiff intended to assert a substantive due process claim on the basis of its deprivation of a cause of action, this claim would also be subject to dismissal.

"[T]he Due Process Clause of the Fourteenth Amendment embodies a substantive component that protects against 'certain government actions regardless of the fairness of the procedures used to implement them.'"  *Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 217 (2d Cir. 2012) (quoting *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 460 (2d Cir. 1996)).

34

"The protections only attach to: (i) conduct that 'shocks the conscience,' and (ii) conduct that violates a fundamental right—a right implicit in the concept of ordered liberty." *Everest Foods Inc. v. Cuomo*, 585 F. Supp. 3d 425, 439 (S.D.N.Y. 2022) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)).

Plaintiff has not alleged conduct that falls into either description. First, Plaintiff has identified no fundamental right that is implicated, nor is one evident. Plaintiff's cause of action derives from Plaintiff's contractual rights under the Guaranty and "[t]he Second Circuit has held that 'simple, state-law contractual rights, without more, are not worthy of substantive due process protection.'" *Marino v. City Univ. of New York*, 18 F. Supp. 3d 320, 339 (E.D.N.Y. 2014) (quoting *Tessler v. Paterson*, 451 F. App'x 30, 33 (2d Cir. 2011)). Second, Plaintiff fails to plausibly allege conduct that shocks the conscience. Plaintiff has alleged no facts from which this Court could conclude that the Guaranty Law is the type of "arbitrary action" or "egregious official conduct" "intended to injure in some way unjustifiable by any government interest." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998). Plaintiff's substantive due process claim therefore is also dismissed.

### D.   New York Constitution Article IX and Municipal Home Rule Law[7]

The allegations in the Amended Complaint that the Guaranty Law violates Article IX of the New York Constitution and the New York Municipal Home Rule Law will be examined concurrently because both rely on Plaintiff's allegations that the law violates two provisions of the New York Constitution and "the general law of New York." Am. Compl. ¶¶ 75–81. The

---

[7] Defendants argue that if the federal claims are dismissed, the Court should decline to exercise supplemental jurisdiction over the state-law claims including the breach of contracts claim. Dkt. No. 46 at 14; Dkt. No. 58 at 2–4. However, because Plaintiff's Contracts Clause claim under the U.S. Constitution survives, this argument is moot and the Court does not dismiss the breach of contracts claim on this basis.

Amended Complaint alleges that the Guaranty Law violates both the due process (N.Y. Const. art. I, § 6) and takings provisions (N.Y. Const. art. I, § 7) of the New York Constitution.  *Id.* ¶¶ 79–80.  The Amended Complaint also alleges that the Guaranty Law "violates the general law of New York, by invalidating the Plaintiff's long-established contractual rights with regard to the Guaranty, destroying Plaintiff's cause of action and remedies with regard thereto, and totally and permanently preventing Plaintiff from ever recovering the debts due thereunder."  *Id.* at ¶ 81.

When a federal court exercises jurisdiction over state-law claims, "the law to be applied . . . is the law of the state.  And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern." *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  Thus, federal courts look to the New York Court of Appeals, New York's highest court, for guidance.  The New York Court of Appeals has held that the guarantees of the takings clause and the equal protection and due process clauses of the New York Constitution are coextensive with those of the U.S. Constitution.  *See Am. Econ. Ins. Co. v. State,* 87 N.E.3d 126 (N.Y. 2017); *Heidel v. Hochul*, 2021 WL 4942823, at *9 (S.D.N.Y. Oct. 21, 2021), *aff'd sub nom. Heidel v. Governor of New York State*, 2023 WL 1115926 (2d Cir. Jan. 31, 2023) (summary order) ("The guarantee against Takings provided by the New York Constitution is generally treated as coextensive to that of the U.S. Constitution."); *Guan N. v. NYC Dep't of Educ.*, 2013 WL 67604, at *20 (S.D.N.Y. Jan. 7, 2013) ("The New York State Constitution's guarantees of equal protection and due process are virtually coextensive with those of the United States Constitution.").  Accordingly, where a takings or due process claim under the U.S. Constitution is dismissed, the same claim under the New York Constitution should also be dismissed.  *See Heidel*, 2021 WL 4942823, at *11; *Guan N.*, 2013 WL 67604, at *20.

Here, the Court has already dismissed Plaintiff's federal takings and due process claims. The Court dismisses Plaintiff's claims brought under the takings and due process clauses of the New York Constitution for the same reasons.

Plaintiff also alleges that the Guaranty Law violates both the Municipal Home Rule Law and the New York Constitution because it is in conflict with the general law of New York, "which clearly allows parties to enter into guarantees of debts and to enforcement [*sic*] of those guarantees." Dkt. No. 60-4 at 18–19. The New York Constitution grants the City the "power to adopt and amend local laws *not inconsistent with* the provisions of this constitution or *any general law relating to*," inter alia, (a) "its property, affairs or government," and (b) "[t]he government, protection, order, conduct, safety, health and well-being of persons or property therein . . . ." N.Y. Const. art. IX, § 2(c). "To implement article IX, the Legislature enacted the Municipal Home Rule Law." *DJL Rest. Corp. v. City of New York*, 749 N.E.2d 186, 189 (N.Y. 2001). "It specifically gives a municipality, such as the City of New York, the power to enact local laws for the 'protection and enhancement of its physical and visual environment' and for the 'government, protection, order, conduct, safety, health and well-being of persons or property therein.'" *Id.* (quoting Municipal Home R. L. § 10(1)(ii)(a)(11)–(12)). "In keeping with article IX, however, the Municipal Home Rule Law prohibits the City from adopting local laws inconsistent with the State Constitution or any general law of the State." *Id.*

This claim fails as well. As the City Defendant correctly states, the Amended Complaint does not "articulate any direct conflict between the Guaranty Law and any state statute." Dkt. No. 46 at 16. Further, in conducting an inquiry into this question, the lower court in *Melendez v. City of New York* could "find no state law prohibiting the temporary limitation of personal guaranties, nor does any of the Governor's pandemic-related EOs address this issue."

*Melendez v. City of New York*, 503 F. Supp. 3d 13, 38 (S.D.N.Y. 2020), *rev'd on other grounds*, 16 F.4th 992. This Court can find none either. Thus, Plaintiff's assertion that the Guaranty Law violates the general law of New York is unavailing.[8] The motion to dismiss these state-law claims is granted.

**CONCLUSION**

The Toasties Defendants' motion to set aside the default is GRANTED, and the entry of default is vacated. The motions to dismiss are GRANTED IN PART and DENIED IN PART. The motion to dismiss is GRANTED with respect to Plaintiff's claims under the Takings Clause and the Due Process Clause of the United States Constitution as well as the claim brought under the New York Constitution and the Municipal Home Rule Law. The motion to dismiss is DENIED with respect to Plaintiff's claim brought under the Contracts Clause of the U.S. Constitution and the claim for breach of contract under New York State law.

The Clerk of the Court is directed to vacate the certificate of default against the Toasties Defendants and to close Dkt. Nos. 44, 53, 56.

SO ORDERED.

Dated: March 23, 2023
New York, New York

LEWIS J. LIMAN
United States District Judge

[8] Plaintiff also attempts to raise for the first time in its memorandum of law in opposition to Defendants' motions to dismiss the argument that (i) the Guaranty Law is preempted by state law because "New York State law already regulates the field of leases and landlord-tenant relations"; and (ii) Guaranty Law is *ultra vires* because it does not relate to an inherently local matter, and thus the Guaranty Law is invalid under the Municipal Home Rule Law. Dkt. No. 60-4 at 20–23. The Court will not address these claims. Plaintiff did not raise either claim in its Amended Complaint and "plaintiffs cannot use their opposition to the motion to dismiss to raise new claims or arguments." *Louis v. New York City Hous. Auth.*, 152 F. Supp. 3d 143, 158 (S.D.N.Y. 2016).