UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 06/06/2024
```

-------------------------------------------------------------------X
:
RURADAN CORPORATION,                                       :
:
                            Plaintiff,                     :
:
                    -v-                                    :          22-cv-3074 (LJL)
:
                                                          :          OPINION AND ORDER
CITY OF NEW YORK ET AL.,                                   :
:
                            Defendants.                    :
:
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Ruradan Corporation ("Plaintiff" or "Ruradan") brings claims against defendants

L&K 48 Venture, Inc. ("L&K Venture") and JLee 19 Corp. ("JLee" and, together with L&K

Venture, "Tenants"), and defendants Jin Choi, Matthew Ahn, and Raymond Kim (collectively

"Guarantors" and, together with Tenants, "Defendants" or "Toasties Defendants"), related to the

default of a commercial lease at 8 East 48th Street New York, New York.  Dkt. No. 40.  The

parties have agreed to trial of this matter on the papers.[1]  Dkt. Nos. 123, 172, 174 at 12.  This

Opinion and Order constitutes the Court's findings of fact and conclusions of law for purposes of

Federal Rule of Civil Procedure 52(a)(1).  To the extent any statement labeled as a finding of fact

---

[1] *See, e.g.*, *Pristine Jewelers NY, Inc. v. Broner*, 567 F. Supp. 3d 472, 474 (S.D.N.Y. 2021)
(bench trial on the papers); *U.S. Fire Ins. Co. v. SS "LIONS GATE BRIDGE"*, 1997 WL 10923,
at *5 (S.D.N.Y. Jan. 10, 1997) (relying on deposition transcripts, affidavit, and stipulated facts as
the entire trial record where parties have consented to such a trial and neither has sought to cross-
examine any witness beyond the examination reflected in the proffered deposition transcripts); *E.
Cont'l Mining & Dev. Ltd. v. Signet Grp. LLC*, 2015 WL 5707145, at *1 (S.D.N.Y. Sept. 29,
2015) (conducting bench trial on the papers pursuant to the parties' consent); *Lightbox Ventures,
LLC v. 3rd Home Ltd.*, 2018 WL 1779346, at *1 (S.D.N.Y. Apr. 13, 2018) (same); *see also
O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 642 F.3d 110, 116 (2d Cir. 2011)
(holding that district court may conduct a "bench trial 'on the papers'" so long as it is "clear that
the parties consent to a bench trial on the parties' submissions").

is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

## FINDINGS OF FACT

Ruradan is a corporation organized and existing under the laws of New York, with a place of business in New York, New York.  Dkt. No. 130 ¶ 4.[2]  It is the owner and landlord of the premises located at 8 East 48th Street, New York, New York 10017 (the "Building").  *Id.* ¶ 6. L&K Venture is a New York corporation that was dissolved as of November 19, 2021, with a last known registered place of business at 6 East 48th Street, New York, New York 10017.  Dkt. No. 135-1.  JLee is a New York corporation, formed May 30, 2019, with a registered place of business located at 6 East 48th Street, New York, New York 10017, that does business as "Toasties."  Dkt. No. 135-2.

On May 15, 2014, Ruradan entered into a commercial lease (the "Lease") with L&K Venture for the use and occupancy of the premises known as Store No. 1, as subsequently modified to Store No. 3, at 8 East 48th Street, New York, New York 10017 (the "Premises"), "for the retail use as a delicatessen, together with the retail sale of groceries ancillary thereto." Dkt. No. 130 ¶ 7; Dkt. No. 130-2, at ECF p. 1; *id.* at ECF p. 24 § 76.1.  The original term of the Lease was for ten years, commencing on September 1, 2014 and ending on August 31, 2024. Dkt. No. 130-2, at ECF p. 8.  The Lease provided that the tenant would pay a fixed rent of $282,767.68 in the first year (or $23,563.97 per month), to be increased based on a formula calculated as the greater of: (i) 103.50% of the fixed rent for the immediately prior year; or (ii) the fixed rent for the prior year increased at the same rate as the consumer price index.  *Id.*  In

---

[2] These findings of fact are drawn from the declarations of Jonathan R. Elyachar, Dkt. Nos. 130, 137, Jin Choi, Dkt. No. 134, and Peter Lee, Dkt. Nos. 135, 142, as well as the documents attached to and authenticated by their declarations, which the parties agreed would constitute the evidence in this case.  No party requested cross-examination.  Dkt. No. 172.

addition, the tenant was required to pay additional rent, comprised of a portion of the real estate taxes on the Building. *Id.* at ECF p. 9.

On May 15, 2014, Jin Choi, Matthew Ahn, and Raymond Kim entered into a guaranty (the "Guaranty") in favor of Ruradan. Dkt. No. 130 ¶ 9; Dkt. No. 130-3. The Guaranty acknowledged that L&K Venture had entered into the Lease with Plaintiff, that each Guarantor was a shareholder of L&K Venture, and that Ruradan would not have entered into the Lease unless each Guarantor had executed and delivered the Guaranty. Dkt. No. 130-3. Paragraph 2 of the Guaranty provides as follows:

> Each Guarantor hereby unconditionally and irrevocably guarantees to Landlord: (i) the due and punctual payment in full (and not merely the collectability) by Tenant of the rent and additional rent due and payable under the Lease; and (ii) the full and timely performance and observance of all of the terms, covenants, conditions, and obligations under the Lease. Each Guarantor hereby covenants and agrees to and with Landlord, that if default shall at any time be made by Tenant in the timely payment of rent and/or additional rent, which default continues beyond any applicable period of notice and grace set forth in the Lease, or if Tenant should default in the performance and observance of any of the terms, covenants, conditions and obligations contained in the Lease on Tenant's part to be observed and performed, which default continues beyond any applicable period of notice and grace set forth in the Lease, Guarantor shall and will forthwith pay such rent and additional rent to Landlord, and any arrears thereof, and shall and will forthwith faithfully perform and fulfill all of such terms, covenants, conditions and obligations and will also forthwith pay to Landlord all damages that may arise in consequence of any default by Tenant under the Lease including, without limitation, all reasonable attorney's fees and disbursements incurred by Landlord in connection with or by reason of any such default and/or in the enforcement of the terms of the Lease and this Guaranty. Nothing contained herein shall diminish any of Landlord's rights against Tenant under the terms of the Lease. Provided that Tenant is not then in default of any of its obligations under the Lease, Guarantor's obligations hereunder shall be limited to the period of time commencing on the date hereof and terminating on the day that the Tenant delivers possession of the Premises to Landlord, in broom clean condition, free of all tenancies, subtenancies and occupants, and otherwise in accordance with the terms of the Lease.

*Id.* ¶ 2. The Landlord is defined as Ruradan and the Tenant is defined as L&K Venture. *Id.* at ECF p. 1. Each Guarantor acknowledged that the Guaranty was "an absolute and unconditional guaranty of payment and performance and not merely of collection." *Id.* ¶ 3(B).

By an Assignment and Assumption of Lease Agreement dated August 2019, and with the consent of Ruradan, the Lease was assigned by L&K Venture to JLee.  Dkt. No. 130 ¶¶ 12–13; Dkt. No. 130-4.[3]  In addition, in August 2019, Ruradan, L&K Venture and JLee agreed to extend the term of the Lease for five years to August 31, 2029.  Dkt. No. 135-6.

Consistent with the terms of the Lease, JLee operated a delicatessen/eatery known as "Toasties" at the Premises.  Dkt. No. 134 ¶ 2.  The business relied almost exclusively on customers who worked in nearby office buildings and who frequented Toasties during breakfast and lunch hours.  Dkt. No. 134 ¶ 3.  Plaintiff also fully complied with all of its obligations under the Lease, as modified, and the Guaranty.  Dkt. No. 130 ¶ 17.

In or about January 2020, the COVID-19 virus began to dramatically impact life in the United States.  On January 31, 2020, the United States Department of Health and Human Services declared the COVID-19 virus a public health emergency.  *See* Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus, U.S. Dep't Health & Human Servs. (Jan. 31, 2020).  On March 11, 2020, the World Health Organization declared COVID-19 to be a global pandemic.  *See WHO Director-General's Opening Remarks at the Media Briefing on COVID-19—11 March 2020*, World Health Org. (Mar. 11, 2020), https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

On March 7, 2020, then-Governor Andrew Cuomo of New York issued an Executive Order declaring "a State disaster emergency for the entire State of New York."  Dkt. No. 126-1

---

[3] The Guaranty is a "continuing one" and each Guarantor agreed that its obligations would not be affected by the assignment of the Lease by L&K Venture.  Dkt. No. 130-3 ¶ 5.

at ECF p. 1.  On March 16, 2020, Governor Cuomo signed Executive Order 202.3, which directed, in relevant part, as follows:

> Any restaurant or bar in the state of New York shall cease serving patrons food or beverage on-premises effective at 8 pm on March 16, 2020, and until further notice shall only serve food or beverage for off-premises consumption.

*Id.* at ECF p. 4.  Two days later, on March 18, 2020, Governor Cuomo signed Executive Order 202.6, which directed "[a]ll businesses and not-for-profit entities in the state [to] utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize," and that each employer reduce their in-person workforce at any work location by fifty percent no later than March 20, 2020.  *Id.* at ECF p. 7.  The next day, March 19, 2020, Governor Cuomo signed Executive Order 202.7.  *Id.* at ECF p. 8.  Among other things, Executive Order 202.7 directed that "all barbershops, hair salons, tattoo or piercing parlors and related personal care services" would be closed to members of the public, and that all employers would reduce their in-person workforce at any work location by seventy-five percent.  *Id.* at ECF p. 9.[4]  It was in this context that on or about May 13, 2020, the City voted to authorize legislation codified at N.Y.C. Admin. Code § 22-1005 (the "Guaranty Law"), which became effective on May 26, 2020, and which, as subsequently amended, made certain guaranty provisions in commercial leases or other rental agreements unenforceable against natural persons.  Dkt. No. 136 ¶¶ 59, 67, 69.  In particular, the Guaranty Law established a defense against commercial landlords seeking to enforce, under certain circumstances, personal guarantees of commercial leases for defaults that accrued between March 7, 2020 and June 30, 2021.  Dkt. No. 136 ¶¶ 69, 107.

---

[4] On September 9, 2020, Governor Cuomo issued Executive Order 202.61, which allowed "indoor food services and dining in New York City beginning September 30, 2020."  Dkt. No. 126-2 at ECF p. 5.

The COVID-19 pandemic and the ensuing public health response had an impact on Toasties.  In or about April 2020, JLee defaulted under the terms of the Lease, as modified, and the Guarantors defaulted under the terms of the Guaranty, by failing to make payment of sums due under the Lease.  Dkt. No. 130 ¶ 17.  In or about April or May 2020, after having noticed that payments had not been made under the Lease or the Guaranty, Elyachar spoke to Choi to inquire as to why the Tenants had defaulted on the Lease.  *Id.* ¶ 19.  Choi told Elyachar that their suppliers were not giving them 30–60 day credit terms as they had previously provided and were instead requiring up-front cash payments, and that the delicatessen's financial supporters did not want to provide further support to the store.  *Id.*

In May 2020, Elyachar and Choi negotiated terms for the deferral and abatement of rent going forward, but Defendants chose not to enter into the agreement.  *Id.* ¶ 24.  Although the parties dispute when the Tenants vacated the Premises, *compare* Dkt. No. 134 ¶ 7 (claiming Tenants vacated the Premises in July 2020), *with* Dkt. No. 137 ¶ 30 (claiming Tenants did not vacate the Premises until September 2020), Plaintiff alleges, Dkt. No. 137 ¶ 31, and Defendant Jin Choi testified to the same effect, Dkt. No. 136-2 at 58:2–14, that Defendants did not return the keys to Plaintiff until October 2020.

In May 2021, when Plaintiff received interest from another potential tenant in the rental of the Premises, Elyachar spoke again with Choi and asked her whether the Tenants wished to return to the Premises.  Dkt. No. 130 ¶ 26.  He was informed that they did not.  *Id.*  In or about May 2021, Ruradan entered into a lease agreement with a new tenant for the Premises, with a commencement date of July 2021.  *Id.*  About two weeks later, Elyachar received a call from Choi that the Tenants had changed their minds and wished to return to the Premises, but Elyachar informed Choi that Ruradan had entered into a lease with a new tenant.  *Id.* ¶ 27.

6

The last monthly payment made under the Lease was received in March 2020 and consisted of $27,986.60 for rent and $15,305.60 for taxes. *Id.* ¶ 39. Defendants failed to make a payment in April and May of 2020 and then made a payment of $20,200 in June 2020 and a payment of $10,000 in July 2020. *Id.* Thereafter, no payments were made on the Lease. *Id.*

The total amount due and owing on the Lease through the termination date of August 31, 2029 was $1,822,444.95. *Id.* ¶ 40. Plaintiff has received rent from the new tenant in the amount of $959,538.50. *Id.* Plaintiff incurred legal fees of $14,116.50 and commissions of $123,104.32 in finding the new tenant. *Id.* As a result, Plaintiff calculates that as of December 22, 2023, Plaintiff was owed $1,000,127.27 under the Lease. *Id.* ¶ 38.

## CONCLUSIONS OF LAW

### I.  Jurisdiction

Plaintiff's amended complaint, which is operative here, includes five causes of action brought against two sets of defendants. Dkt. No. 40. The first four causes of action—(i) that the Guaranty Law violates the Contracts Clause of the United States Constitution, *id.* ¶¶ 30–51; (ii) that the Guaranty Law violates the Takings Clause of the United States Constitution, *id.* ¶¶ 52–66; (iii) that the Guaranty Law violates Plaintiff's rights under the Due Process Clause of the United States Constitution, *id.* ¶¶ 67–73; and (iv) that the Guaranty Law violates the New York Constitution and Municipal Home Law, *id.* ¶¶ 74–84—were brought against the City of New York (the "City"). The fifth cause of action, for breach of contract, *id.* ¶¶ 85–91, was brought against the Toasties Defendants.

On August 24, 2022, the City moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss each of the four claims against it in the amended complaint for failure to

state a claim upon which relief could be granted.[5]  Dkt. Nos. 44–46.  On August 26, 2022, the

Toasties Defendants also moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), to

dismiss the amended complaint as against them for failure to state a claim upon which relief

could be granted.  Dkt. No. 53.  On March 24, 2023, the Court issued an Opinion and Order

granting the motion to dismiss Plaintiff's claims under the Takings Clause and the Due Process

Clause of the United States Constitution, and Plaintiff's claim brought under the New York

Constitution and Municipal Home Rule Law, but denying the motion to dismiss with respect to

the claim brought under the Contracts Clause of the United States Constitution, and the claim

brought for breach of contract.  Dkt. No. 89.  The Court held that the Plaintiff had failed to state

a claim for relief under the Takings and Due Process Clauses of the United States Constitution or

under the New York Constitution and Municipal Home Rule Law.  *Id.* at 15–38.

On December 22, 2023, the City, *see* Dkt. No. 124, the Toasties Defendants, *see* Dkt. No.

132, and Plaintiff, *see* Dkt. No. 128, each moved for summary judgment.  The City based its

motion in part on an argument that Plaintiff lacked Article III standing to bring its claim against

the City.  *See* Dkt. No. 127 at 12–15.  On April 10, 2024, the Court issued an Opinion and Order

granting the City's motion for summary judgment, and dismissing the remaining claim against

the City brought under the Contracts Clause.  *See* Dkt. No. 170.  The Court held that Plaintiff had

abandoned its claim for damages against the City, *see id.* at 7–14, and that Plaintiff lacked

Article III standing to pursue its remaining claims for declaratory and injunctive relief against the

City.  *See id.* at 14–21.  The Court also stated that it would exercise supplemental jurisdiction

over the remaining breach of contract claim against the Toasties Defendants under 28 U.S.C.

---

[5] At the time, the City did not raise any issue with respect to Plaintiff's standing to bring claims
against it.

§ 1367(a).  *Id.* at 21 ("Such 'claims that are so related to claims in the action' come from the same 'common nucleus of operative fact' as the claims providing the court with original jurisdiction." (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004), *cert. denied*, 544 U.S. 949 (2005))).

After the Court's ruling on the City's motion for summary judgment, the only remaining claim in the case was against the Toasties Defendants for breach of contract.  Nonetheless, on April 29, 2024, the City filed a letter on the docket asserting that, "[b]ecause all federal claims were dismissed for lack of subject-matter jurisdiction, [the] court cannot exercise supplemental jurisdiction."  Dkt. No. 171 at 1; *see also id.* at 1 n.2 ("[T]he City is of the opinion that supplemental jurisdiction is foreclosed as a matter of law, rather than discretion.").  The City pointed to Second Circuit caselaw stating that, "when a district court correctly dismisses all federal claims for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the district court is thereby precluded from exercising supplemental jurisdiction over related state-law claims." *Id.* at 2 (quoting *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 399 (2d Cir. 2017)).  At the direction of the Court, Plaintiff and the Toasties Defendants responded to the City's letter, on May 3, 2024.  Although Plaintiff disagreed with the City and argued that the Court was not foreclosed as a matter of law from exercising supplemental jurisdiction, *see* Dkt. No. 177, the Toasties Defendants wrote in support of the City's letter and argued that the Court could not exercise supplemental jurisdiction, *see* Dkt. No. 176.

The City's argument is mistaken.[6]  The Court has subject matter jurisdiction.  The assertion of a claim for relief under federal law vests the Court with federal subject matter

---

[6] Indeed, the City retreated from its argument when the Court held oral argument on the issue on May 14, 2024.

jurisdiction unless the claim "appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Bell v. Hood*, 327 U.S. 678, 682–83 (1946); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (same); *Carlson v. Principal Fin. Grp.*, 320 F.3d 301 306 (2d Cir. 2003) (same). Once the court is vested with subject matter jurisdiction based on a federal question, it has supplemental jurisdiction over all related claims that form part of the same case or controversy. 28 U.S.C. § 1367. That is the conclusion that the Court implicitly reached on April 10, 2024. Because Plaintiff's claims against the Toasties Defendants are related to the federal claims against the City and form part of the same case or controversy, the Court has subject matter jurisdiction over them. *Kirschner v. Klemons*, 225 F.3d 227, 239 (2d Cir. 2000). It is immaterial that the Takings and Due Process Claims have been dismissed. The Court dismissed those claims for failure to state a claim for relief, not for lack of jurisdiction, and the claims were neither wholly insubstantial nor frivolous. The Court therefore reaffirms its prior decision that it has subject matter jurisdiction and that it will exercise that jurisdiction over the remaining breach of contract claim under 28 U.S.C. § 1367(a).

The Court also has personal jurisdiction over Defendants. The Tenants agreed to submit to the jurisdiction of this Court "in any action or proceeding arising out of [the] lease and/or the use and occupancy of the . . . Premises." Dkt. No. 130-2 § 75. The Guarantors agreed to submit to the jurisdiction of this Court "for the purposes of each and every suit, action or other proceeding arising out of or based upon th[e] Guaranty." Dkt. No. 130-3 ¶ 8(A). The Lease and the Guaranty are governed by New York law. *See* Dkt. No. 130-2 § 75 ("This lease shall be governed in all respects by the laws of the State of New York."); Dkt. No. 130-3 ¶ 14(D) ("The validity and enforcement of this Guaranty shall be governed by and construed in accordance with

the internal laws of the State of New York without regard to principles of conflicts of law, and

such laws shall apply in any action or proceeding arising out of or under this Guaranty.").

## II.  The Claim for Breach of Contract

The elements of a claim for breach of contract under New York law are: (i) the existence

of a valid, binding contract, (ii) the plaintiff's performance thereunder, (iii) the defendant's

breach of the contract, and (iv) damages suffered by the plaintiff as a result of the breach.

*Markov v. Katt*, 176 A.D.3d 401, 401–402 (1st Dep't 2019); *Thor Gallery at S. Dekalb, LLC v.*

*Reliance Mediaworks (USA) Inc.*, 143 A.D.3d 498, 498 (1st Dep't 2016) (holding on summary

judgment that "[landlord] established prima facie the existence of the lease . . . the tenant's

failure to pay the rent . . . and the calculation of the amounts due under the lease"); *Harris v.*

*Seward Park Hous. Corp.*, 79 A.D.3d 425, 426 (1st Dep't 2010); *A/R Retail LLC v. Hugo Boss*

*Retail, Inc.*, 149 N.Y.S.3d 808, 818 (N.Y. Co. Sup. Ct. May 19, 2021).  The obligation to pay

rent and additional rent at a specified time "is an essential part of the bargain as it represents the

consideration to be received for permitting the tenant to remain in the possession of the property

of the landlord."  *Medlock Crossing Shopping Center Duluth, Ga. Ltd. P'ship v. Kitchen & Bath*

*Studio*, 6 N.Y.S.3d 834, 836 (4th Dep't 2015) (quoting *Fifty States Mgt. Corp. v. Pioneer Auto*

*Parks*, 389 N.E.2d 113, 116 (N.Y. 1979)).  To establish a claim for breach of guaranty under

New York law, a plaintiff must "prove 'the existence of the guaranty executed by defendant, the

underlying debt, and defendant's failure to perform under the guaranty.'"  *Cooperatieve Centrale*

*Raiffeisen-Boerenleenbank, B.A. v. Navarro*, 36 N.E.3d 80, 84 (N.Y. 2015) (quoting *Davimos v.*

*Halle*, 826 N.Y.S.2d 61 (1st Dep't 2006)); *KLS Diversified Master Fund, L.P. v. McDevitt*, 507

F. Supp. 3d 508, 530 (S.D.N.Y. 2020); *Sarfati v. Palazzolo*, 37 N.Y.S.3d 537 (1st Dep't 2016).

"Where a guaranty is clear and unambiguous on its face and, by its language, absolute and

unconditional, the signer is conclusively bound by its terms absent a showing of fraud, duress or

other wrongful act in its inducement." *Citibank, N.A. v. Uri Schwartz & Sons Diamonds Ltd.*, 948 N.Y.S.2d 275, 278 (1st Dep't 2012) (quoting *Nat'l Westminster Bank USA v. Sardi's Inc.*, 571 N.Y.S.2d 712 (1st Dep't 1991)).

It is undisputed that the contracts exist between the parties, namely the Lease and the Guaranty, and that Plaintiff has performed.  It is also undisputed that there have been events of default under the Lease and the Guaranty.  *See* Dkt. No. 174 at 1 ("Defendants do not deny their failure to pay rent and additional rent.").  Defendants argue that they are not liable to Plaintiff for breach of contract, however, because the Lease contains a force majeure clause that excuses their nonperformance, because the doctrine of frustration of purposes provides a defense for nonperformance, and because the doctrine of impossibility excuses their nonperformance.  *See id.* at 2–8.[7]

### A.      Force Majeure

Defendants first argue that their nonperformance under the Lease is excused under a force majeure clause in the Lease.  *See id.* at 2.  According to Defendants, the Lease contains a force majeure clause that is only *inapplicable* where the "Owner is unable to fulfill any of its obligations under this lease."  Dkt. No. 130-2 § 26.  Defendants argue that "[u]nder any reasonable interpretation of" Section 26 of the Lease, "then-Governor Cuomo's executive orders not only qualify as 'restrictions,' 'rule, order or regulation' or 'conditions' that were never within any party's control, but the parties also intended to excuse at least one party from nonperformance under such circumstances."  Dkt. No. 174 at 3.  Accordingly, Defendants assert

---

[7] Despite the fact that the Guaranty Law was the subject of several of Plaintiff's claims in this action, Defendants do not invoke the Guaranty Law in their own defense against Plaintiff's breach of contract claim.  *See* Dkt. No. 174.  The Court therefore does not address whether the Guaranty Law provides them safe harbor here.

that they "are entitled to be excused for nonperformance no less than Plaintiff can avail of its one-sided force majeure clause." *Id.*

Defendants' argument is unpersuasive.  In full, Section 26 of the Lease states as follows:

This lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of Tenant to be performed shall in no way be affected, impaired or excused because Owner is unable to fulfill any of its obligations under this lease, or to supply, or is delayed in supplying, any service expressly or impliedly to be supplied, or is unable to make, or is delayed in making, any repair, additions, alterations or decorations, or is unable to supply, or is delayed in supplying, any equipment, fixtures or other materials, if Owner is prevented or delayed from doing so by reason of any rule, order or regulation of any department or subdivision thereof of any government agency, or by reason of the conditions of which have been or are affected, either directly or indirectly, by way or other emergency, or when, in the judgment of Owner, temporary interruption of such services is necessary by reason of accident, mechanical breakdown, or to make repairs, alterations or improvements.

Dkt. No. 130-2 § 26.

By its terms, the force majeure provision establishes that, even in the event that Plaintiff is unable to perform its obligations under the Lease due to the specified conditions, Tenants are not excused from their obligation to make payments of rent.  In other words, the provision does almost the precise opposite of what Defendants assert that it does—rather than excusing nonperformance during, for example, disruptions due to an "order or regulation of any department or subdivision thereof of any government agency" or due to "conditions of which have been or are affected, either directly or indirectly, by way or other emergency," Section 26 serves to clarify that Tenants remain bound to their obligation to pay rent and perform all other of their obligations under the Lease.  The clear and unambiguous text of the provision therefore does not provide Defendants an excuse for their nonperformance.  *See, e.g.*, *Beardslee v. Inflection Energy, LLC*, 904 F. Supp. 2d 213, 221 n.10 (N.D.N.Y. 2012) (internal quotations and citations omitted) ("[A]pplication of [a] Force Majeure Clause is governed by contract language."), *aff'd* 798 F.3d 90 (2d Cir. 2015); *see also A.X.M.S. Corp. v. Friedman*, 948 F. Supp.

2d 319, 332 (S.D.N.Y. 2013) (citations omitted) ("It is well accepted that courts should construe contracts according to the parties' intent," as derived "from the plain meaning of the language employed in the [relevant agreement]" when the agreement is "read as a whole."); *Eternity Global Master Fund, Ltd. v. Morgan Guar. Tr.*, 375 F.3d 168, 177 (2d Cir. 2004) ("[T]he best evidence of intent is the contract itself; if an agreement is 'complete, clear and unambiguous on its face[, i]t must be enforced according to the plain meaning of its terms.'" (quoting *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002))); *Cole v. Macklowe*, 953 N.Y.S.2d 21, 23 (1st Dep't 2012) (noting the "well settled principle that a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties").

Nor is the applicability of the provision at all affected by the fact that it allocates the risk of disruption due to the named circumstances to the Tenants.  It is true that under New York law, and specifically in the context of a force majeure clause, "[l]anguage in contracts placing one party at the mercy of the other is not favored by the courts." *Rynasko v. N.Y. Univ.*, 63 F.4th 186, 200 (2d Cir. 2023) (quoting *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 438 (1994)).  But that principle is invoked only when necessary to resolve contractual ambiguities and, in that context, it is instructive of the parties' intent.  *See Fleischman v. Furgueson*, 223 N.Y. 235, 241 (1918) ("A court will endeavor to give the [contract] construction most equitable to both parties instead of the construction which will give one of them an unfair and unreasonable advantage over the other.").  Here, there is no such ambiguity to resolve. Further, the Second Circuit has distinguished between "sweeping disclaimer[s]" and "more traditional, and enforceable, *force majeure* clause[s]." *Goldberg v. Pace Univ.*, 88 F.4th 204, 211 (2d Cir. 2023).  The Second Circuit has defined the latter as a "contractual provision

allocating the risk of loss if performance becomes impossible or impracticable, especially as a result of an event or effect that the parties could not have anticipated or controlled." *Rynasko*, 63 F.4th at 200 n.16 (quoting *Force-Majeure Clause*, Black's Law Dictionary (11th ed. 2019) (alterations adopted)). The provision at issue here falls squarely into that definition—allocating the risk of loss if *Plaintiff's* performance becomes impossible or impracticable to Tenants. The Court therefore finds that the plain meaning of Section 26, enforceable by its terms, does not excuse Defendants' nonperformance.

### B. Frustration of Purpose

Defendants argue that they should be excused from their failure to perform under the doctrine of frustration of purpose. Dkt. No. 174 at 5. "The doctrine of frustration of purpose discharges a party's duties to perform under a contract where a 'wholly unforeseeable event renders the contract valueless to one party.'" *Axginc Corp. v. Plaza Automall, Ltd.*, 759 F. App'x 26, 29 (2d Cir. 2018) (summary order) (quoting *United States v. Gen. Douglas MacArthur Senior Vill., Inc.*, 508 F.2d 377, 381 (2d Cir. 1974)). "In order to be invoked, the frustrated purpose must be so completely the basis of the contract that, as both parties understood, the transaction would have made little sense." *Reed v. Luxury Vacation Home LLC*, 632 F. Supp. 3d 489, 512 (S.D.N.Y. 2022) (quoting *Gap Inc. v. Ponte Gadea N.Y. LLC*, 524 F. Supp. 3d 224, 234 (S.D.N.Y. 2021)); *In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 839–40 (Bankr. S.D.N.Y. 2020); *see also Bank of Am. Nat'l Tr. & Sav. Ass'n v. Envases Venezolanos, S.A.*, 740 F. Supp. 260, 266 (S.D.N.Y.), *aff'd sub nom., First Nat'l Bank of Md. v. Envases Venezolanos, S.A.*, 923 F.2d 843 (2d Cir. 1990) (explaining that the doctrine of frustration of purpose discharges a party's duties to perform where "an unforeseen event has occurred, which, in the context of the entire transaction, destroys the underlying reasons for performing the contract, even though performance is possible"); Restatement (Second) of Contracts § 265, cmt. a (1981).

15

"The event which allegedly frustrates performance must be both 'virtually cataclysmic' and 'wholly unforeseeable.'"  *Gap Inc.*, 524 F. Supp. 3d at 234 (quoting *Gander Mountain Co. v. Islip U-Slip LLC*, 923 F. Supp. 2d 351, 359 (N.D.N.Y. 2013)).  The doctrine of frustration of purpose is "a narrow one which does not apply unless the frustration is substantial."  *Crown It Servs. v. Koval-Olsen*, 782 N.Y.S.2d 708, 711 (1st Dep't 2004) (quotation marks and citation omitted).  "The doctrine has its origin in what are known as the coronation cases," in which "defendant was excused from his duty of payment for use of the plaintiff's apartment along the route of the coronation procession, when the procession was cancelled because the King became ill."  *A/R Retail*, 149 N.Y.S.3d at 821 (quotation marks and citations omitted).  "The modern version of this doctrine, recognized by New York courts, has evolved as narrower" than the cases from which it is derived.  *Noble Ams. Corp. v. Cit Grp./Equip. Fin., Inc.*, 2009 WL 9087853, at *5 (N.Y. Co. Sup. Ct. Dec. 4, 2009).  "Examples of a lease's purposes being declared frustrated have included situations where the tenant was unable to use the premises as a restaurant until a public sewer was completed, which took nearly three years after the lease was executed . . . and where a tenant who entered into a lease of premises for office space could not occupy the premises because the certificate of occupancy allowed only residential use and the landlord refused to correct it."  *Gap Inc.*, 524 F. Supp. 3d at 234 (quoting *Ctr. for Specialty Care, Inc. v. CSC Acquisition I, LLC*, 185 A.D.3d 34, 42–43 (1st Dep't 2020)).

"Many New York courts assessing commercial lease disputes amidst the COVID-19 pandemic have held that the temporary and evolving restrictions on a commercial tenant's business do not warrant rescission or other relief based on the frustration-of-purpose doctrine."  *In re NTS W. USA Corp.*, 2021 WL 4120676, at *4 (S.D.N.Y. Sept. 9, 2021), *aff'd*, 2022 WL 10224963 (2d Cir. Oct. 18, 2022) (summary order); *see, e.g.*, *A&R Real Est., Inc. v. Dorian N.Y.*

16

*LLC*, 2023 WL 6257267, at *12 (S.D.N.Y. Sept. 26, 2023); *Gap Inc.*, 524 F. Supp. 3d at 234;

*Arista Dev., LLC v. Clearmind Holdings, LLC*, 207 A.D.3d 1127, 1130 (4th Dep't 2022); *558*

*Seventh Ave. Corp. v. Times Square Photo Inc.*, 149 N.Y.S.3d 55, 56 (1st Dep't 2021) (requiring

tenant to pay rent despite the fact that its business was "shuttered for a period as a result of

pandemic-related executive orders"); *A/R Retail LLC*, 149 N.Y.S.3d at 823 (rejecting frustration-

of-purpose defense because "[t]he pandemic triggered several months of 'shutdown' followed by

an evolving set of capacity restrictions that have reduced (but not eliminated) Tenant's ability to

generate revenue from its retail operation").  Those courts have relied, in part, on provisions in

the leases addressing the consequences of casualties and governmental actions outside the

control of the landlord or tenant that suggest that the restrictions imposed by the Governor's

Executive Orders (if not the pandemic that precipitated those orders) were not "wholly

unforeseeable."  *Gap Inc.*, 524 F. Supp. at 234; *see also In re Condado Plaza Acquisition*, 620

B.R. at 840 ("Nor is the [frustration-of-purpose] defense available if the terms of the contract

impose the relevant risks on one of the parties.").  They have also concluded that, in the context

of a multi-year commercial lease, the temporary shut-down of business did not "completely

alte[r] the fundamental basis" of the lease or render it without economic value.  *In re NTS W.*

*USA Corp.*, 2021 WL 4120676, at *6.  As Chief Judge Swain reasoned, the fact that the tenant

"may suffer particularly adverse financial consequences from the COVID-19 pandemic does not

amount to frustration of the purpose of the Lease."  *Gap Inc.*, 524 F. Supp. 3d at 235–36.

Those holdings, and the reasoning that underlies them, apply with full force here.

Defendants argue that the frustration of purpose doctrine relieves them of their rent obligations

because Toasties "could not operate without its full workforce, let alone with only 25% of its full

workforce."  Dkt. No. 174 at 6.  JLee's principal, Jin Choi, avers that Governor Cuomo's

Executive Orders "decimated [Toasties's] sales because [Toasties] lost [its] many customers who worked in nearby office buildings" and "forced [Toasties] to reduce [its] workforce to such a degree that [JLee was] unable to operate Toasties."  Dkt. No. 134 ¶¶ 4–5.  But, although the particulars of the COVID-19 pandemic and the effect that it would have on Defendants' business might not have been easily anticipated, it was not "wholly unforeseeable" that during the fifteen-year term of the lease there might be governmental orders or events outside the control of either the landlord or the tenant that would impair Defendants' ability to conduct business.  The Lease, for example, gives the landlord the right to "suspend the service of any utilities, when necessary" by reason of any "rule, regulation or law of any governmental authority, or by reason of any other cause beyond the control of Landlord," without relieving Defendants of the obligation to pay rent.  *See* Dkt. No. 130-2 § 78.  The Lease also makes accommodation for the circumstances in which "the demised premises or any part thereof shall be damaged by fire or other casualty." *Id.* § 9(a).  Tellingly, the Lease contains a section titled "Inability to Perform," which anticipates that the Landlord might be unable to fulfill its obligations under the Lease because of "government preemption or restrictions, or by reason of any rule, order or regulation of any department or subdivision thereof of any government agency, or by reason of the conditions of which have been affected, either directly or indirectly, by war or other emergency . . . ." *Id.* § 26. Such provisions in the Lease indicate that severe disruptions, including disruptions caused by governmental orders, were anticipated and that the Lease was intended to serve as the instrument to allocate the risks associated with those disruptions.

Moreover, Defendants have not shown that the Executive Orders rendered the Lease "valueless" to Defendants, *Axginc Corp.*, 759 F. App'x at 29  (quoting *Gen. Douglas MacArthur Senior Vill., Inc.*, 508 F.2d at 381), or of "little sense," *Gap Inc.*, 524 F. Supp. 3d at 234 (quoting

*In re Condado Plaza Acquisition*, 620 B.R. at 839–40).  At the time of the Governor's March

2020 order, Defendants had secured for themselves the use of the Premises for a term that

continued until the end of August 2029.  Dkt. No. 135-6.  By the time that the shutdown order

was lifted and restaurants were permitted to resume on-premises service, JLee still had almost

nine years left on the Lease.  *See Greater N.Y. Auto. Dealers Ass'n, Inc. v. City Spec, LLC*, 2020

WL 8173082, at *9 (N.Y. Civ. Ct. 2020) ("[E]ven if Respondent were forced by the Executive

Order to close in-person operations at the Premises, a four-month closure out of a five-year lease

did not frustrate the overall purpose of the Lease.").  It is undoubtedly correct that the COVID-19

pandemic itself, as well as the Executive Orders issued in response to the pandemic, inflicted

devastation upon parts of midtown Manhattan and made operation of the delicatessen less

profitable (or unprofitable) during at least the term that such Orders were in effect.  But the risk

that there will be periods of unprofitability is one that all businesses take.  "It is not

enough . . . that the transaction will be less profitable for an affected party or even that the party

will sustain a loss."  *Gap Inc.*, 524 F. Supp. 3d at 234 (quoting *In re Condado Plaza Acquisition*,

620 B.R. at 839–40).  The Lease was one to operate a delicatessen and to sell retail products

ancillary thereto.  Even as to the period that the Executive Orders were in effect, there is no

showing that Defendants were unable to offer service on the curb or takeout service.  "This is not

a case where the office space leased was destroyed or where a tenant rented a unique space for a

specific purpose that can no longer serve that function."  *1140 Broadway LLC v. Bold Food,

LLC*, 2020 WL 7137817, at *2 (N.Y. Sup. Ct. Dec. 3, 2020).  The doctrine of frustration of

purposes therefore does not excuse Defendants' nonperformance of the Lease and the Guaranty.

### C.    Impossibility

Defendants next argue that they should be excused from their failure to perform under the

doctrine of impossibility.  Dkt. No. 174 at 7.  "Impossibility (also known as 'impracticability') is

an affirmative defense under New York law against liability for nonperformance of a contractual

obligation." *Siemens Energy, Inc. v. Petróleos de Venez., S.A.*, 82 F.4th 144, 153–54 (2d Cir.

2023) (citing *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 22 (2d Cir. 2018), and

*Knickerbocker Retail LLC v. Bruckner Forever Young Soc. Adult Day Care Inc.*, 167 N.Y.S.3d

462, 464 (1st Dep't 2022)); *see also* Restatement (Second) of Contracts § 261 (1981).  "Under

New York law, '[i]mpossibility excuses a party's performance only when the destruction of the

subject matter of the contract or the means of performance makes performance objectively

impossible.'"  *Siemens Energy*, 82 F.4th at 153 (alteration in original) (quoting *Kel Kim Corp. v.

Cent. Mkts., Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987)).  "Moreover, the impossibility must be

produced by an unanticipated event that could not have been foreseen or guarded against in the

contract." *Kel Kim*, 519 N.E.2d at 296.  "The defense is available to a party whose performance

'is made impracticable without [the party's] fault by the occurrence of an event the non-

occurrence of which was a basic assumption on which the contract was made.'"  *Siemens*

*Energy*, 82 F.4th at 153 (alteration in original) (quoting Restatement (Second) of Contracts § 261

(1981)).  The New York Court of Appeals has cautioned "that a defense to contract performance

such as impossibility should be applied narrowly and only in extreme circumstances 'due in part

to judicial recognition that the purpose of contract law is to allocate risks . . . .'"  *Sher v. Allstate*

*Ins. Co.*, 947 F. Supp. 2d 370, 383 (S.D.N.Y. 2013) (alteration in original) (quoting *Kel Kim*, 519

N.E.2d at 296).

     A number of courts have rejected the impossibility defense as an excuse for tenants not

performing contractual obligations, such as payment of rent, during the COVID-19 pandemic.

*See, e.g.*, *Maesa LLC v. TPR Holdings LLC*, 2020 WL 5499231, at *1–2 (N.Y. Sup. Ct. Sept. 9,

2020) ("[D]efendant submits no evidence or explanation of how performance was impossible . . .

rather than being difficult due to the pandemic."); *35 E. 75th St. Corp. v. Christian Louboutin L.L.C.*, 2020 WL 7315470, at *3 (N.Y. Sup. Ct. Dec. 9, 2020) ("[T]he impossibility doctrine does not compel the Court to deny the instant motion.  The subject matter of the contract—the physical location of the retail store—is still intact.  And defendant is permitted to sell its products.  The issue is that it cannot sell enough to pay the rent.  That does not implicate the impossibility doctrine."); *1140 Broadway*, 2020 WL 7137817, at *2 (rejecting impossibility defense where tenant's primary business—managing and consulting for a group of restaurants—was made unprofitable by the shutdown of the restaurant industry).

The Court agrees with those decisions and finds that the impossibility defense does not apply here.  As noted in *Gap*, the "impossibility defense fails because the very text of the Lease demonstrates that the conditions that [the tenant] claims render performance impossible were foreseeable."  524 F. Supp. 3d at 237 (citing *Gander Mountain Co.*, 923 F. Supp. 2d at 362).

To the extent Tenant's impossibility argument is predicated on government orders—both during the shutdown period and afterward—provisions contained in the Lease and previously cited herein indicate that the risk of such disruptions was not unforeseeable.  *See* Dkt. No. 130-2 § 26 (anticipating that the landlord might be unable to perform under the Lease due to "government preemption or restrictions, or by reason of any rule, order or regulation of any department or subdivision thereof of any government agency, or by reason of the conditions of which have been affected, either directly or indirectly, by war or other emergency").  And with respect to the reopening period, it is undisputed that Tenant operated Toasties during that time; accordingly, although its business was made difficult by the pandemic, Tenant's performance under the Lease was not objectively impossible.  *See, e.g., Maesa*, 2020 WL 5499231

("[D]efendant submits no evidence or explanation of how performance was impossible . . . rather than being difficult due to the pandemic."); *A/R Retail*, 149 N.Y.S.3d at 826.

Defendants' arguments that the impossibility doctrine apply are unavailing.  Defendants argue that "[w]ithout their full workforce and regular office worker customers (now required to 'work from home'), . . . Defendants' means of 'operating a first-class *retail* delicatessen' had become impossible."  Dkt. No. 174 at 7–8 (emphasis in original).  Tenants rented the Premises for an original ten-year period, which was subsequently extended by an additional five years.  The evidence establishes that, for roughly a six-month period during that lease term, Defendants were prohibited from offering on-premises food and beverage service.  But Defendants leased the Premises to operate it for "retail use as a delicatessen," and to offer "the retail sale of groceries ancillary thereto."  Dkt. No. 130-2 at ECF p. 1.  There was nothing that prohibited Defendants from using the Premises to prepare delicatessen foods for their patrons, and from offering those foods for consumption off-premises.  It may be that the Executive Orders—and the impact those orders had on the businesses that supplied the patrons of the delicatessen— made the continued operation of the business impractical (at least for the period of time of the shut-down orders), but that impact does not suffice to establish the "destruction of the subject matter" of the contract here.  *See 1140 Broadway LLC*, 2020 WL 7137817, at *2.  Defendants' nonperformance is therefore not excused under the impossibility doctrine.

### III. Damages

Plaintiff seeks an award of $1,684,245.02, which is comprised of $4,233,873.07 due and owing by Defendants to Plaintiff under the Lease and the Guaranty through August 31, 2029, less $2,676,848.87 in rent payable by the new tenant of the Premises to Plaintiff through August 31, 2029, plus the legal fees and commission costs incurred in securing the new tenant of

$137,220.82.[8]  *See* Dkt. No. 173 at 2; Dkt. No. 137-14.  Plaintiff also seeks an award of interest

from April 13, 2022 through the entry of Judgment, as well as attorneys' fees and costs incurred

in bringing this action.  Dkt. No. 173 at 1–2; Dkt. No. 40 at ECF pp. 16–17.  Defendants do not

contest the amount Plaintiff claims is due and owing under the Lease or the Guaranty through

August 31, 2029, or the amount incurred by Plaintiff as expenses in securing a new tenant.

Instead, Defendants argue that Plaintiff failed to mitigate damages, and is barred by judicial

estoppel from asserting damages in excess of $291,131.90, the amount Plaintiff first sought when

it commenced an action in the Suffolk County Supreme Court based upon Defendants' alleged

breach of the Lease and the Guaranty.  *See* Dkt. No. 174 at 8–11.

### A.    Mitigation of Damages

Defendants first argue that Plaintiff failed to mitigate damages.  Defendants contend that

Plaintiff relet the Premises under unreasonable terms by not charging the subsequent tenant for

the Premises any rent for the fourteen months from November 2020 through December 2021,

and by charging no taxes for the six months thereafter (from January 2022 through June 2022).

---

[8] In its amended complaint, Plaintiff seeks "a Judgment in the sum of $1,000,127.27."  Dkt. No.
40 at ECF p. 16.  In its pretrial memorandum, however, Plaintiff writes that it seeks a Judgment
of $1,684,245.02.  Dkt. No. 173 at 1–2; *see also* Dkt. No. 137-14.  Plaintiff explains that the
discrepancy is because its initial request in the amended complaint "was . . . only for charges
through the end of the initial lease term of August 2024," Dkt. No. 137 ¶ 28, while the new
requested amount reflected all "charges due to August 2029," *id.* ¶ 29.  "Federal Rule of Civil
Procedure 15(b)(2) allows parties to amend their pleadings to conform to the proof received into
evidence at trial."  *DiMare Homestead, Inc. v. Alphas Co. of N.Y., Inc.*, 547 F. App'x 68, 69 (2d
Cir. 2013) (summary order).  The Toasties Defendants do not object to amendment to conform to
the pleadings.

"As a general principle, district courts should freely grant a plaintiff leave to amend the
complaint."  *Nakahata v. N.Y.–Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 198 (2d Cir.
2013).  "The decision of whether to allow such an amendment is left to the discretion of the
district court judge."  *Vt. Plastics, Inc. v. Brine, Inc.*, 79 F.3d 272, 279 (2d Cir.1996).  Because
Plaintiff has submitted sufficient evidence for the Court to assess the appropriate award of
damages, and finds that the renewed request is supported by that evidence, the Court exercises its
discretion to permit amendment of the pleadings and the assertion of a new value of damages.

Dkt. No. 174 at 9.  Defendants further argue that Plaintiff charged the subsequent tenant rent at a rate far lower than fair market value.  *Id.*  The arguments are without merit.

A commercial landlord in New York has no duty to mitigate when a tenant abandons a property prior to the expiration of the lease.  *See 172 Van Duzer Realty Corp. v. Globe Alumni Student Assistance Ass'n, Inc.*, 25 N.E.3d 952, 956 (N.Y. 2014); *Holy Props. v. Cole Prods.*, 661 N.E.2d 694, 696 (N.Y. 1995).  The New York Court of Appeals has explained that "unlike executory contracts, leases have been historically recognized as a present transfer of an estate in real property.  Once the lease is executed, the lessee's obligation to pay rent is fixed according to its terms and a landlord is under no obligation or duty to the tenant to relet, or attempt to relet abandoned premises in order to minimize damages."  *Holy Props.*, 661 N.E.2d at 696 (internal citations omitted).  It thus is legally irrelevant that Plaintiff allegedly delayed in reletting the Premises or accepted a below-market rent from the new tenant.  Once Tenants ceased paying rent and abandoned the Premises, Ruradan had the options to "do nothing and collect the full rent due under the lease," or to relet the Premises for the benefit of the tenant, using the rent collected first to pay its own expense in reentering and reletting the Premises and then to pay the tenant's rent obligation.  *Id.*; *see also Trustees of Columbia Univ. in City of N.Y. v. D'Agostino Supermarkets, Inc.*, 162 N.E.3d 727, 730 (N.Y. 2020) ("In accordance with the parties' commercial tenancy, in the event of a breach, plaintiff had two options: (1) allow defendant to maintain possession of the property for the full lease term and hold defendant liable for past and future rent, or (2) reenter the premises and collect all rent due up to the time of reentry.  If it chose to reenter, plaintiff could relet the premises and defendant would be liable for any deficiency in rent and other related expenses.").  The Lease provides that in the case of any default, Ruradan had the right to relet the Premises and that the Tenant would pay Ruradan as liquidated damages any deficiency

between the rent covenanted to be paid and the net amount, if any, of the rents collected on account of the subsequent lease or leases.  Dkt. No. 130-2 at ECF p. 3.  Defendants' arguments are therefore without merit.

> ### B.    Judicial Estoppel

Defendants next argue that the principle of judicial estoppel bars Plaintiff from seeking damages in excess of the amount Plaintiff sought in its original state court action.  Dkt. No. 133 at 20; Dkt. No. 174 at 11.  In that action, Plaintiff asserted damages of $291,131.90.  Dkt. No. 137-7 ¶ 18 (alleging that "[a]s of June 31, 2021, Defendants are duly indebted to Plaintiff under the provisions of the said Lease, as modified, and Guaranty, in total sum of $291,131.90, not including attorneys' fees and expenses").  Defendants argue that Plaintiff should be bound to that figure.  Dkt. No. 133 at 20; Dkt. No. 174 at 11.

Under the doctrine of judicial estoppel, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."  *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)); *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 485–86 (2d Cir. 2014).  Judicial estoppel applies when: "1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel.'"  *DeRosa*, 595 F.3d at 103 (quoting *New Hampshire*, 532 U.S. at 750–51); *see Lesnik v. Lincoln Fin. Advisors Corp.*, 2020 WL 3057456, at *1 (S.D.N.Y. June 9, 2020).  Plaintiff's prior pleading does not give rise to estoppel.  It was not adjudicated and Plaintiff did not prevail on it.  Plaintiff voluntarily dismissed the state-court

action.  Dkt. No. 130 ¶ 32; Dkt. No. 135-13.  At best, therefore, the allegation constitutes an

evidentiary admission of a party opponent, and that is how the Court has considered it.  But,

giving the prior allegation the weight only of an admission, the effect of it is clearly outweighed

by the undisputed evidence of the damages suffered by Plaintiff.  Defendants' judicial estoppel

argument lacks merit.

### C.    Attorneys' Fees and Costs

Plaintiff argues that it is entitled to the payment of all costs, including reasonable

attorneys' fees, associated with bringing this action.  Dkt. No. 173 at 3.  Plaintiff points to a

provision of the Lease which states:

> If Tenant shall default in the observance of performance of any term or covenant
> on Tenant's part to be observed and performed under, . . . and if Owner, in
> connection therewith or in connection with any default by Tenant in the covenant
> to pay rent hereunder, makes any expenditures or incurs any obligations for the
> payment of money, including but not limited to reasonable attorneys' fees, in
> instituting, prosecuting or defending any actions or proceeding, and prevails in any
> such action or proceeding, such sums so paid or obligations incurred with interest
> and costs shall be deemed to be additional rent hereunder and shall be paid by
> Tenant to Owner . . . .

Dkt. No. 130-2 § 19.  Additionally, the Guaranty provides that "Guarantor shall and will

forthwith pay such rent and additional rent to Landlord, . . . and will also forthwith pay to

Landlord all damages that may arise in consequences of any default by Tenant under the Lease,

including, without limitation, all reasonable attorney's fees and disbursements incurred by

Landlord in connection with or by reason of any such default and/or in the enforcement of the

terms of the Lease and this Guaranty."  Dkt. No. 130-3 ¶ 2.

"Under the 'American Rule' a prevailing party is ordinarily not entitled to attorneys' fees

except where expressly provided by statute or contract."  *Westchester Fire Ins. Co. v. Massamont

Ins. Agency, Inc.*, 420 F. Supp. 2d 223, 227 (S.D.N.Y. 2005).  "Under New York law, a

prevailing party may recover attorney's fees from the losing party where authorized by . . .

agreement." *Varbero v. Belesis*, 2020 WL 5849516, at *7 (S.D.N.Y. Oct. 1, 2020); *N.Y.C. Dist. Council of Carpenters v. JFD Sales Consulting Servs. Corp.*, 2017 WL 4736742, at *2 (S.D.N.Y. Oct. 19, 2017) ("[Under New York law,] a contractual provision for the payment of [attorneys' fees and costs] provides a basis to award them."); *Constellation Newenergy, Inc. v. Om Vegetable, Inc.*, 2022 WL 334707, at *5 (S.D.N.Y. Aug. 12, 2022) (awarding attorneys' fees in breach of contract action based upon contractual provision). In New York, however, "the court should not infer a party's intention to provide counsel fees as damages for a breach of contract unless the intention to do so is unmistakably clear from the language of the contract." *AT&T Corp. v. Publ'g Concepts L.P.*, 2010 WL 1191380, at *5 (S.D.N.Y. Mar. 29, 2010) (Chin, J.) (quoting *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003)); *see also NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) ("Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear."). In that light, "[t]o ensure that fees are not awarded in the absence of an express agreement, the courts have interpreted such provisions strictly." *Nationwide Auction Co. v. Lynn*, 1996 WL 148489, at *9 (S.D.N.Y. Apr. 1, 1996). Here, the clear and unambiguous text of the Lease and the Guaranty provide for the award of attorneys' fees and costs; the Court therefore finds that such an award to Plaintiff is appropriate.

### D.   Prejudgment Interest

Plaintiff is also entitled to an award of prejudgment interest. New York law applies to the question whether an award of prejudgment interest is appropriate. *See Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir.1998) (holding that state law applies to calculation of prejudgment interest on supplemental state law claims). "[I]n an action at law for breach of contract under New York law, 'prejudgment interest is recoverable as of right.'" *TNR Logistics*

*Co. v. Status Logistics Corp.*, 2018 WL 4062633, at \*4 (E.D.N.Y. Aug. 27, 2018) (quoting

*Trademark Rsch. Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 342 (2d Cir. 1993)); *see* N.Y.

C.P.L.R. § 5001(a) ("Interest shall be recovered upon a sum awarded because of a breach of

performance of a contract.").  "If the parties failed to include a provision in the contract

addressing the interest rate that governs after principal is due or in the event of breach, New

York's statutory rate will be applied as the default rate."  *NML Cap. v. Republic of Argentina*,

952 N.E.2d 482, 488–89 (N.Y. 2011).  Although the Lease provides for the award of

prejudgment interest in the event of default, it does not specify a particular rate.  *See* Dkt. No.

130-2 § 19 ("If Tenant shall default in the observance or performance of any term or covenant on

Tenant's part to be observed or performed . . . and if Owner, in connection therewith or in

connection with any default by Tenant in the covenant to pay rent hereunder, makes any

expenditures or incurs any obligations for the payment of money, including but not limited to

reasonable attorney's fees, in instituting, prosecuting or defending any actions or proceeding, and

prevails in any such action or proceeding, such sums so paid or obligations incurred *with interest*

and costs shall be deemed additional rent hereunder and shall be paid by Tenant to Owner . . . ."

(emphasis added)).  The court therefore applies New York's statutory rate as the default rate.

"Under New York law, in a breach of contract action, 'prejudgment interest must be calculated

on a simple interest basis at the statutory rate of nine percent' per year, with certain exceptions

that are not relevant here."  *Jamil v. Solar Power Inc.*, 230 F. Supp. 3d 271, 277 (S.D.N.Y. 2017)

(citing N.Y. C.P.L.R. §§ 5001 and 5004); *see also Marfia*, 147 F.3d at 90 ("New York courts

have held that in a breach of contract action of this sort prejudgment interest must be calculated

on a simple interest basis at the statutory rate of nine percent."); *Constellation Newenergy, Inc*,

2022 WL 3334707, at *4; *Rhee v. SHVMS, LLC*, 2023 WL 8889697, at *10 (S.D.N.Y. Dec. 26, 2023).

Plaintiff has requested that the prejudgment interest begin to accrue on April 13, 2022. *See* Dkt. No. 137 ¶ 29.  Interest generally runs from "the earliest ascertainable date the cause of action existed."  N.Y. C.P.L.R. § 5001(b).  But "[c]ourts have 'wide discretion in determining a reasonable date from which to award pre-judgment interest, and interest is calculated using the simple . . . [rather than] a compounded rate.'"  *Kuan v. Notoriety Grp. LLC*, 2023 WL 3937317, at *11 (S.D.N.Y. May 22, 2023) (quoting *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 49 (E.D.N.Y. 2015)), *report and recommendation adopted*, 2023 WL 3936749 (S.D.N.Y. June 9, 2023).  Plaintiff is therefore entitled to prejudgment interest at a statutory rate of nine percent per year beginning on April 13, 2022.

## CONCLUSION

The Court finds Defendants liable to Plaintiff for breach of contract.  Plaintiff is directed to submit a proposed judgment in accordance with this Opinion and Order, including evidence of its costs and reasonable attorneys' fees.

The Clerk of Court is respectfully directed to close Dkt. Nos. 128, 132.


SO ORDERED.

Dated: June 6, 2024
      New York, New York                  LEWIS J. LIMAN
                                        United States District Judge